## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    :

               v.                    :          Case No. 3:11 CR 41 (SRU)

FRANCISCO ILLARRAMENDI,                    :

              Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANT'S SENTENCING MEMORANDUM

### I.  Factual Background

#### a.  Personal & Family

Francisco Illarramendi is a 45-year-old father of two children, ages 8 and 9, with no prior criminal arrest or conviction history.  See PSR, at 16-17, 20. He was born in Venezuela, but he spent early childhood years in the United States while his father served as an official at the Venezuelan Embassy.  He left the United States to accompany his family to Jamaica, and later to Venezuela, in light of his father's ambassadorial appointments and eventual retirement from the Venezuelan political scene.  PSR, at 17.  In 1981, Mr. Illarramendi and his family moved to Bethesda, Maryland, at which time he began residing permanently in the United States.  PSR, at 17-18.  He attended college and graduate school, and holds a Bachelor's degree in International Relations and Politics, and a Master's degree in Economics. PSR, at 21-22.

#### b.  Work in the Finance Industry

Prior to the instant offense, Mr. Illarramendi worked in the securities industry with Credit Suisse from 1994 to 2004, conducting extensive work in Latin American countries, including Venezuela ("BROV").  PSR, at 23.  While at Credit Suisse, Mr. Illarramendi was the leader of a

team that developed a bolivar to U.S. dollar ("BVD/USD") arbitrage mechanism that spawned the BROV's ability to fund itself at significantly discounted interest rates.  In 2004, he took a sabbatical from Credit Suisse, and began a special assignment as an advisor to Venezuela's national oil company "Petroleos de Venezuela, S.A." (PDVSA).  PSR, at 22-23.  During this assignment Mr. Illarramendi generated approximately $1.6 billion in savings, when based on his advice, PDVSA was able to repurchase $2.0 billion in outstanding bonds, utilizing Mr. Illarraendi's arbitrage innovation.  Thereafter, the BROV began issuing profitable bonds.  PSR, at 22.  Specifically, Mr. Illarramendi advised the Venezuelan government to issue bonds denominated in U.S. dollars, which were purchased using bolivars ("BVD") at the official exchange rate.  This allowed the financing of currency exchanges, and lower yields than would otherwise be available in the international markets.  PSR, at 5.  Ultimately, Mr. Illarramendi's instruction and advice paid dividends well into the future, to the tune of billions of dollars for the BROV and PDVSA.

### c.  Credit Suisse to PDVSA to Private Sector; Illarramendi's Companies

In 2005, after his assignment with PDVSA, Mr. Illarramendi left Credit Suisse to work for Highview Point Partners (HVP) and set up the Highview Point Funds (HPF) with two former Credit Suisse colleagues.  PSR, at 22-23.[1]  Between 2006 and 2011, he also founded, owned, and helped operate, the Michael Kenwood Group (MK).  PSR, at 22.  Mr. Illarramendi continued to operate in the field of BROV bonds, and was engaged in the market of currency arbitrage for the "BROV" and "PDVSA," particularly as it related to the purchase and sale of Credit Linked

---

[1] Mr. Illarramendi left HPF when the fund came under the examination of the SEC in 2010.

[2] As part of his guilty plea and in an attempt to assist the U.S. Attorney, the Receiver, and the SEC, Mr. Illarramendi has been clear (even in testimony given in the related civil matter before

Notes and other U.S. dollar ("USD") denominated bonds.  A basic grasp of these types of

transactions is necessary for one to understand the evolution of Mr. Illarramendi's offense

conduct.

### d. The Transactions: Credit Linked Notes ("CLNs") and Currency Arbitrage

Credit Linked Notes ("CLNs") are instruments linked to performance of underlying

securities;  essentially derivative financial contracts, where one party assumes the risk of a

purchased security failure, and posts collateral with the counter party.  In the case of security

failure, the collateral is forfeited.  Contrariwise, where the underlying security does not fail, the

collateral posting party earns back both the collateral and the negotiated interest.  The transaction

can be viewed as a form of insurance or wager.  Simply put, one party is betting that the

underlying security will fail, while the other party is betting that it will not fail;  one party hedges

its risk exposure, while the other party welcomes the risk, in exchange for attractive profit and

gain.

Typically, these structured notes were linked to debt performance in the BROV, as well

as other Latin American countries such as Ecuador, Brazil and Argentina.  During the relevant

period, Venezuelan debt was an attractive investment vehicle because of high rates of return.

The high interest rates correlated with the investment's inherent risk;  BROV bonds were viewed

as high-risk investments, which is the very reason why the BROV had to offer high interest rates.

By contrast, for example, U.S. Treasury Bonds can remain attractive paying ultra low rates of

interest, in light of their status as extremely low risk investments.  BROV debt necessarily

required higher rates of interest to attract investors, in light of the higher political and economic

risks of failure.  It is against this backdrop, that Mr. Illarramendi's advice and counsel, first while

at CS, and later as part of his work at HVP and MK, produced substantial gains for the BROV in spite of the high risk environment that would normally thwart investment.

Credit Suisse ("CS") played a deep pocket role in the purchase of Venezuelan securities in these transactions. But when it perceived itself to be over-exposed, it desired to "hedge" its risks by issuing CLNs. To do so, CS entered into credit-linked notes with "counter parties," at very attractive rates. Illarramendi's funds, acting as a counter party, purchased notes from Credit Suisse for a specified time, during which the funds bore the risk of BROV default. If the BROV defaulted on the bonds, which were the subject of the contract, Credit Suisse could keep the collateral, and the funds would inherit the worthless bonds along with the task of enforcement or collection. If, however, upon expiration of the contract, the BROV had not defaulted, the Illarramendi funds would regain collateral along with the attractive interest rates accompanying the transaction.

In connection with these transactions Mr. Illarramendi also facilitated counterparty funding; Promissory Notes that referenced certain CLNs would be used to complete the funding agreements. The Receiver, who has elsewhere targeted entities involved in funding counterparty positions, appears to adopt the view that the funding parties entered into meaningless notes carrying usurious interest rates. But this position is untenable, and can be explained away quite readily[2]. Mr. Illarramendi's CLN work formed an aspect of legitimate business, ab initio, and the investments and profit records in the hands of the Receiver wholly

---

[2] As part of his guilty plea and in an attempt to assist the U.S. Attorney, the Receiver, and the SEC, Mr. Illarramendi has been clear (even in testimony given in the related civil matter before Hon. Judge Arterton) that a portion of the Promissory Notes issued in the course of his business dealings, were not used for further investment, but as a source for financing shortfalls.

undermine any claim to the contrary.  For the following reasons, the Receiver's attempt to sully

Mr. Illarramendi's legitimate business ventures should be scrutinized.

Firstly, the counterparty investors mostly bore actual economic risk pursuant to the

contracts, as well as the obligation to post collateral.  The collateral posted was real, and the

Receiver possesses an abundance of bank records confirming the transfer of millions of dollars

from investors to the Illarramendi funds.  Simply put, if the BROV defaulted, investors would

clearly lose their money;  real money, which they invested, and which was posted in "at risk"

transactions.  Essentially, the reality of the risk and potential for loss upon default, clearly

illustrates the "arms length" aspect of these transactions.  Thus, the Receiver's view that these

transactions were all "fictitious," simply ignores the actual economic realities attendant upon the

same.

Secondly, the view ignores the reality of BROV sovereign debt market volatility, and the

need to offer high rates of return.  As noted above, unlike Treasury Bills, which pay very low

returns, high-risk BROV bonds linked to the Venezuelan economy and its unstable market,

typically needed to offer interest rates upward of fourteen percent (14%) to remain attractive.

The market and the political conditions created the rate, as opposed to the same being assigned

arbitrarily;  accordingly, the "usurious" label is not only inaccurate, but also incommensurate

with the realities of then current BROV political and financial environments.

Finally, such a view ignores the backdrop of the currency arbitrage market designed by

Mr. Illarramendi while at CS and used by the BROV to generate lower funding costs, while at

the same time, generating huge profitability in its local and international capital markets.

Essentially, by allowing local market investors to purchase bonds and CLNs in bolivars at the

official exchange rate, the government could sell the securities at prices that exceeded their

market value in U.S. dollars, while at the same time permitting the investors access to U.S. dollars at much lower than otherwise available on the parallel market.  As a consequence of the enormous profits on such transactions, the VEB/USD arbitrage designed by Mr. Illarramendi became an ingenious mechanism to facilitate the reduction and/or payoff of BROV short-term debt.  Notably, said reductions and/or payoffs were identified and specified as BROV goals, at the time the nation was consulting with Mr. Illarramendi.

The CLN and other bond transactions in which Mr. Illarramendi participated were legitimate, and clearly designed to serve appropriate business goals.  The transactions involved a sovereign, an actual market, and counterparty funding by investors, all of whom assumed risks commensurate with the expectation of large scale profits in the form of interest generated by their original investments, and the accompanying currency arbitrage gains.  It is simply implausible to assert that Mr. Illarramendi was only involved in fictitious transactions, with "usurious" interest rates.[3]

### e.  Case Origin: A Failed Transaction

In or about October, 2005, Mr. Illarramendi and his family travelled to Venezuela for a wedding;  while there, he was asked to intermediate the purchase and sale of a $50 million Credit Linked Note issued by Credit Lyonnais, which was sold by the BROV in the secondary market to

---

[3] The Receivership's books and records show billions of dollars in purchases and sales of securities that were made in the course of legitimate business, which included advisory services and private equity investments.  Moreover, the Receiver in various lawsuits filed, highlights many of these legitimate transactions.  See e.g., Carney v. Berecha et al.;  Carney v. Montes, and Carney v. Mowaud et al. (referencing billions in purchases and sales in these types of transactions).

Banco Federal.  He undertook to have Highview Point ("HVP")[4] purchase the note from Banco Federal, and sell it to Calyon Securities.  Calyon Securities, however, failed to complete the transaction as contemplated.  Consequently, Mr. Illarramendi endured coercive pressure to complete the transaction;  the failure in this transaction, however, ultimately produced the $5 million loss referred to by the Government as the initial "hole."  While still in Venezuela, Mr. Illarramendi attempted to "back out" of the transaction, however, due to pressure from Banco Federal, and BROV Government officials, he quickly realized that doing so may result in harmful consequences to both himself and/or his family.  It is at this juncture that Mr. Illarramendi began to realize the darker side of the financial success he precipitated in the BROV.

### f.  SEC Investigation

In 2010, the Securities and Exchange Commission (SEC) began an inspection of HVP. As part of the inspection, the SEC sought information and documentation from Mr. Illarramendi and MK in an official SEC enforcement matter.  PSR, at 6.  The SEC further conducted an enforcement-directed review of MK and related entities, thereafter filing a civil complaint[5] against Mr. Illarramendi and one of the MK entities (MK Capital.)  PSR, at 6.  In its Complaint, the SEC alleged, inter alia, that Mr. Illarramendi misappropriated investor money from the funds he managed (the Short Term Liquidity Fund (STLF) and the MK Venezuela Fund (MK VZ)).  In January of 2011, in connection with the SEC proceedings, Mr. Illarramendi was prohibited from making any further monetary transfers from the subject funds.  Furthermore, a Receiver was appointed by the Court to attempt recoupment of assets in these funds, and to ascertain the assets and liabilities of the hedge funds affiliated with MK.  PSR, at 6.

---

[4] Mr. Illarramendi had left Suisse earlier in 2005 to set up Highview Point, an emerging markets corporate debt hedge fund, which also focused on sovereign debt, and structured transactions—particularly the VEB/USD arbitrage transactions in Venezuela.
[5] SEC v. Illarramendi, et al., 3:11-CV-00078 (JBA) (hereinafter the "civil case").

### g. FBI Investigation

Based on the SEC's civil action, the FBI and the U.S. Attorney's Office ("USAO") began a criminal investigation of Mr. Illarramendi, and his operation of HVP and MK. PSR, at 6-7. Shortly after the FBI and USAO began this investigation, Mr. Illarramendi contacted them through his attorney and requested a meeting. PSR, at 7. The meeting took place on February 8, 2011, at which time Mr. Illarramendi detailed and explained to the FBI, and USAO, that he attempted to disguise a loss in managed funds, and had outstanding liabilities that exceeded the true value of the funds' assets.[6] PSR, at 7. According to Mr. Illarramendi the attempt spanned from early 2006 until February of 2011. PSR, at 7. As one part of trying to disguise the true value of the managed funds, Mr. Illarramendi used money provided by new investors in order to pay out the returns promised to previous investors, created documents that misrepresented actual funds assets, made false representations to investors, and commingled managed hedge fund investments. PSR, at 7. Mr. Illarramendi also disclosed that he had to pay bribes and kickbacks to government officials at PDVSA, who were wholly responsible for the investment decisions of the pension funds they controlled. PSR, at 7. The purpose of paying these kickbacks was to assure continued liquidity of the MK funds, and to "close the hole" which necessitated his "scheme" in the first place. PSR, at 7-8. As part of complying with PDVSA officials' demands, Mr. Illarramendi caused his hedge funds to purchase an asset held by PDVSA (the "Harewood asset"[7]) for $35 million, in return for a $100 million investment by PDVSA. PSR, at 8.

Mr. Illarramendi admitted that while he and MK were being investigated by the SEC, he tried to cover the shortfall in the existing hedge fund assets by creating fictitious paper assets.

---

[7] This was a collection of investments held by PDVSA in various mutual funds.

PSR, at 8-9.  Specifically, Mr. Illarramendi admitted that he took part in creating a fictitious letter representing that his Short Term Liquidity Fund had between $275 million and $336 million in credits, based on loans made to Venezuelan companies.  PSR, at 9.  This required the involvement of two other individuals, Juan Carlos Horna Napolitano, and Juan Carlos Guillen Zerpa.  Mr. Illarramendi asked Mr. Horna to help him document the existence of loans by the STLF.  Mr. Horna in turn asked Mr. Guillen to sign a letter on his Venezuelan accounting firm's letterhead, showing a list of loans that could be used to improve the appearance of STLF assets.[8] PSR, at 9.  Mr. Guillen reviewed the proposed letter and suggested some changes that would make the letter "appear more legitimate."  PSR, at 10.

Subsequent to his confession, Mr. Illarramendi rendered substantial aid to the FBI and USAO.  Unlike Mr. Illarramendi, who had withdrew from the conspiracy to obstruct justice by manufacturing fraudulent documents, Mr. Guillen and Mr. Horna sought to complete the deal. Information that Mr. Illarramendi provided and/or gathered, facilitated a fruitful FBI investigation.  Ultimately, both Mr. Horna and Mr. Guillen were arrested by the FBI on March 3, 2011.  PSR, at 13.

### h.  Prosecution and Plea Agreement

Mr. Illarramendi appeared in this Court on March 7, 2011, at which time he waived Indictment and pled guilty to a five count Information alleging two counts of Wire Fraud in violation 18 U.S.C. §1343, one count of Securities Fraud in violation of 15 U.S.C. §§78j(b), one count of Investment Advisor Fraud, in violation of 15 U.S.C. §§80b-6 and 80b-17, and one count of Conspiracy to Obstruct Justice in violation of 18 U.S.C. §371.

---

[8] The letter suggested that STLF lent the equivalent of approximately $275,000,000 to various companies in Venezuela.

Pursuant to the plea agreement letter, the parties in this case have not come to an agreement regarding Mr. Illarramendi's applicable guideline range, fine range, or criminal history category.  Mr. Illarramendi reserved his right to request a downward departure from any applicable guideline range, on any basis, as well as the right to seek a non-guidelines sentence, challenge and oppose any sentencing motion by the Government, and appeal any sentence imposed.  Mr. Illarramendi has also objected via Counsel, to the Guideline calculations prepared by Probation and included in the PSR.

Two issues related to the plea, which plague an appropriate analysis of Mr. Illarramendi's conduct, include:  (1) the apparent presumption that Mr. Illarramendi's stipulation at the time of plea is dispositive, or instructive with respect to the loss calculation, and (2) the constant assertion that Mr. Illarramendi pled guilty to running a Ponzi scheme.

Nowhere in the plea agreement, or in the Court's plea canvass, is the Defendant's knowledge of a USSG "guideline based loss calculation" confirmed;  while he was asked whether investor loss could have been several hundred million dollars, there is no independent evidence suggesting that Mr. Illarramendi's answer correlated to the legal definition of loss, or that he possessed adequate or satisfactory knowledge of "guideline-based loss calculations" applicable to his sentence.  Mr. Illarramendi attempted to clarify his position on loss early, during post plea proffers, when he became more familiar with loss calculation formulas that would apply to his case.

It is difficult to imagine, that the plea, stipulation, and/or canvass, could satisfy this Court that Mr. Illarramendi possessed sufficient knowledge of the Guideline definition of "actual loss," against the backdrop of the many definitions, exclusions, and formulaic applications contained in

the Guideline Notes and in our case law.  In the context of addressing loss enhancement, Courts

in our Circuit have developed constructs for determining the validity and/or weight properly

afforded to offender loss stipulations.  See infra, this Memorandum, Part V, section (e)(ii)

(reviewing several decisions stating that stipulations regarding loss are not dispositive, but call

for determination of full understanding by the offender prior to assigning weight among

considerations of all other evidence).

Likewise, Mr. Illarramendi never pled guilty to running a Ponzi Scheme, and this

nomenclature is perpetuated by the Government's erroneous view that his enterprises did not

conduct legitimate business, and that Mr. Illarramendi did not operate lawfully and/or

legitimately outside of the alleged fraud.  Notably, the Ponzi Scheme defendant is not necessarily

entitled to set off losses with proof of gains to investors, and to the extent the Government can

characterize Mr. Illarramendi's conduct as a giant Ponzi scheme, the actual loss amount stands to

be higher, even though the reality of the same is skewed on this view. The following section

addresses this position more specifically, and this Court is urged to closely consider the

applicability of a Ponzi Scheme label, and the resultant potential exaggeration of actual loss..

## II.  Offense Context:  Fraud, BROV Corruption, Single Power, & Exchange Rates

Fashioning an individualized and particularized sentence in this case rests heavily upon

this Court's recognition of Mr. Illarramendi's legitimate business dealings, along with key

governmental and economic aspects of conducting business in the BROV.

### a. Defendant's Fraud Improperly Characterized as a "Ponzi Scheme"

In spite of the Government's attempt to characterize Mr. Illarramendi as the orchestrator

of a giant Ponzi scheme, both the Government and the Receiver are in receipt of evidence

undermining this assertion.  The Illarramendi funds do not bear the ordinary hallmarks of a Ponzi

scheme.  Illarramendi has a rich history of completing legitimate business transactions,

evidencing clearly defined business related goals, and serving legitimate business purposes, all of

which are easily linked to returned profits and value to investors, including PDVSA, whose

claim in the civil lawsuit currently represents virtually all of the claimed loss asserted by the

Government in the case at bar.

### b.  General Ponzi Attributes Not Applicable to Illarramendi's Conduct

"Ponzi scheme" is a label generally used to describe an investment scheme that is not

really supported by an underlying business venture.  See Cunningham v. Brown, 265 U.S. 1, 7–9,

44 S.Ct. 424, 68 L.Ed. 873 (1924) (describing the modus operandi of the now famous Charles

Ponzi after whom the scheme was named).  Essentially, investors are paid profits from principal

sums paid in by newly attracted investors.  Typically, those who invest in the scheme are

promised large returns on their principal investments and in order to attract new investors, the

initial investors are paid attractive returns as promised.  Accordingly, new investors need to be

attracted in order to ensure that top placed investors are continually paid.  The master of the

scheme typically takes a portion of the invested funds for personal use.  The scheme is one "in

which earlier investors' returns are generated by the influx of fresh capital from unwitting

newcomers rather than through legitimate investment activity." See SEC v. Credit Bancorp, Ltd.,

290 F.3d 80, 89 (2d Cir.2002) (internal quotation marks omitted).  Usually, the growing pyramid

eventually collapses with a multitude of investors "not only [failing to be] paid their profits, but

also los[ing] their principal investments." See In re Randy, 189 B.R. 425, 437 n.17 (Bkrtcy.

N.D. Ill. 1995).

Notably, "[i]n a case involving a fraudulent investment scheme, such as a Ponzi scheme,

loss shall not be reduced by the money or the value of the property transferred to any individual

investor in the scheme in excess of that investor's principal investment."  U.S.S.G.§2B1.1, cmt.

3(F)(iv).  Obviously, the Receiver and the U.S. Attorney benefit from this Court's reception of

Illarramendi's conduct constituting a Ponzi scheme, since the "loss" asserted by them depends

heavily upon this Court's refusal to apply reductions linked to money or value transferred to an

investor, in excess of his or her principal investment.  In short, a decrease in potential set‑off for

purposes of calculating loss, which is the single most important factor in determining Mr.

Illarramendi's fate.

　　　　The rationale behind the Guidelines rule for Ponzi schemes is that "the gain to any

individual investor in the scheme should not be used to offset the loss to other individual

investors because any gain realized by an individual investor is designed to lure others into the

fraudulent scheme," because "Ponzi scheme operators do not provide investors with gains out of

the goodness of their hearts or to lessen damage to investors, but to keep their fraudulent scheme

running."  U.S. v. Alfonso,  479 F.3d 570, 572 (8th Cir.2007).[9]  Simply put, "when a defendant's

only subjective intent regarding repayments relates to this illegal purpose of perpetuating the

scheme, a sentencing court may refuse to credit repayments against sums received from the

victims."  See U.S. v. Hartstein, 500 F.3d 790, 800 (8th Cir.2007).  The evidence in this case

does not demonstrate that Mr. Illarramendi operated a Ponzi scheme, and failure of this Court to

credit repayments for legitimate investments, and lawful transactions, would be incommensurate

with a legitimate application of the guidelines and current case law.  Illarramendi's investments

were not made solely to perpetuate a scheme, and the motive behind the fraud he perpetrated was

---

[9] The Second Circuit Court of Appeals, in its opinion in Hsu, relied primarily on Eighth Circuit
law, as set forth in U.S. v. Alfonso,  479 F.3d 570 (8th Cir.2007) and U.S. v. Hartstein, 500 F.3d
790 (8th Cir.2007).  See Hsu, at 121, n.4.

to conceal a shortfall that he worked diligently to rectify, in order to continue doing legitimate business.

### c. Illarramendi Entities Had Business Purpose & Legitimate Transactions

Mr. Illarramendi has denied, ab initio, that his actions constituted a Ponzi scheme, even though the Government's position to the contrary appears to emanate from his stipulation of conduct, and his admission that money from some investors was used to redeem investments made by others.  Illarramendi's position has always been communicated to the Government in the course of various proffer sessions;  namely, that the investment climate within which he operated gave rise to cash flow management issues.  The resultant use of funds in a manner similar to one aspect of a generally recognized definition of a Ponzi scheme, does not transform all of Illarramendi's activity into one giant Ponzi scheme.

Clearly, Illarramendi operated with a business purpose complimented by financial goals; classically, the lack of an underlying goal oriented business is a key Ponzi characteristic. Notably, Mr. Illarramendi's Michael Kenwood Group (hereinafter "MKG") participated in a wide array of legitimate business transactions which generated significant revenues for certain claimants throughout periods relevant to the instant offense(s).  With all the Government knows from Mr. Illarramendi's proffer sessions and document review, along with the transactional evidence in the hands of the Receiver (which is presumably shared with U.S. Attorney's Office), the Government would be hard pressed to contest the fact that the nominal value of legitimate transactions executed by Mr. Illarramendi, greatly surpassed the value of simple cash flow transfers in this case[10].

---

[10] Once again, the Government, presumably via the Receiver, would be hard pressed to contest books and record evidence that the cash flows of the Receivership Entities significantly dwarfed

It is clear that the Illarramendi entities were operational, and guided by business goals and plans;  in fact, MK and Highview Point Fund (hereinafter "HVP") were involved in many initiatives which undermine the Government's Ponzi assertion.  For example:

(1) **HVP regular fixed income transactions**. From its inception in May, 2005, and the end of 2010, Highview Point Offshore, which became Highview Point Master Fund in 2006, executed hundreds, if not thousands of purchases of fixed income instruments (Bonds, Loans & Credit Linked Notes (hereinafter "CLNs") totaling more than $2.0 billion dollars.  The securities purchased were mainly issued by corporate entities throughout the emerging markets universe, which included Latin America, Eastern Europe, the Middle East, Africa and Asia.  The Receiver, and presumably the Government would be hard pressed to deny this, based upon a simple review of the books and records of Highview Point, which would supply ample evidence of these types of transactions, and undermine the Ponzi scheme assertion.

(2) **New Issue Transactions in BROV-related bonds with Venezuelan Bolivar (VEB)/United States Dollar (USD) Arbitrage:**  From 2005 to 2010, the BROV and its wholly owned companies, including PDVSA and Electricidad de Caracas, executed approximately $30 billion in new issues of debt.  A review of the books and records of HVP and/or MK would demonstrate that both entities placed legitimate orders, and were allocated bonds in most of the transactions, utilizing the VEB/USD arbitrage method of buying bolivars and placing orders through a local intermediary.  Allocated Bonds involved in these orders would likely exceed $500 million, and the same are easily verified by documented transactions to which the Receiver, and presumably the Government have had continuing and complete access.

(3) **Secondary Market Transactions:  Latin America Bonds VEB/USD with VEB/USD Arbitrage:**  Basically the "bread & butter" transactions in VEB/USD arbitrage consisting of participating in auctions held by PDVSA or the BROV.  The Receiver would again be hard pressed to deny (in fact could easily confirm) that the

---

the claim amounts allowed by the Receiver in its distribution plan.  This is virtually definitive proof that real transactions, with tangible profitability, were the hallmark of the businesses comprising the same.  Notably, total cash claims allowed by the Receiver are listed as $350 million, with another $372 million in a non-cash, or in-kind claim, by PDVSA.  Taken together, they total $722 million, while the cash flow distributions from the Receivership to Claimants and others totaled at least $2.0BB during the relevant period.  See Exhibit 1, Receiver's Distribution Plan; compare also, Exhibit 2, Receiver's Sixth Interim Report, and Exhibit 3, Supplemental Ong Declaration, dated December 30, 2014 (hereinafter "Ong II).

entities executed in excess of approximately $4.0 billion in total nominal amount of bonds in these types of transactions.[11]

(4) **Secondary market transactions in Credit Linked Notes with VEB/USD Arbitrage:**  Apart from selling bonds, the BROV and PDVSA also executed CLN transactions similar in execution, profitability and extortion profile, to the transactions with bonds and which stemmed from the overall complex of international investment bank-issued notes that were purchased by the Venezuelan Government and PDVSA mentioned earlier.  It is estimated that Illarramendi entities executed approximately $300 million in these types of transactions, which could also easily be verified by the Receiver.

(5) **Secondary market transactions in Venezuelan bonds USD/USD**;  HVP and MK were also very active in trading BROV-related bonds.  Some of them were sales of bonds placed with the Illarramendi entities as investment in kind by investors, and others involved ordinary trading of securities. The Receiver would have easy access to materials which would confirm an estimated $1.0 billion or more in traded bonds;

(6) **Secondary market transactions-CLN-FONDEN Note Transactions:**  This category would include the Calyon note transaction that gave rise to the original loss.  Due to market expertise, the Illarramendi entities were counterparties of choice for local Venezuelan banks, all trying to sell notes allocated to them by the government as part of the market.

(7) **Credit Suisse TARN Transaction**:  This transaction, which the SEC and the Receiver assert as a basis for "Ponzi" allegations, is actually the launch of MK Venezuela, and is supported by ample documentation held by the Receiver, demonstrating its legitimacy.  The seed investors in this fund agreed to invest under the premise that MK was buying a so-called Target Accrual Redemption Note from Credit Suisse.  The nominal amount of the TARN was $75 million, and the same was credit-linked to Venezuela with a coupon of 30%.  This transaction, from the Defendant's perspective, illustrates an example that stands in polar opposition to the purpose for which it is focused upon by the SEC and the Receiver.

(8) **Consulting and Advisory Transactions**:  MK consulting clearly advised several companies/sovereigns with respect to transactions. In fact, it would be difficult for the Government to deny that at the time the SEC became involved, MK was competing for assignments in the course of business.  For example, and of significance, was the Electricidad de Caracas transaction in 2007.  Extortionate practices generated a significant loss for MK, and PDVSA failed to pay at least $10 million it owed to MK in connection with the transaction.  Moreover the company owned 100% by PDVSA

---

[11] Notably, by their nature, these transactions lent themselves to very heavy extortion, and Mr. Illarramendi has consistently told the Government that profitability in the BROV transactions was heavily reduced via corrupt public official practices and payoffs.

generated over $230 million in gains through the fair market value of the services rendered by MKG in the transaction.

Outside of the BROV, MK also did work for the Swiss Government, carried out a feasibility study for the Andean Development Corporation (CAF) regarding a nuclear power plant refurbishment in Argentina, created and promoted the ARKOR project for cooperation in the nuclear energy field between South Korea and Argentina, became the international marketing arm for Proterra, and had secured a DOE-funded assignment from the Idaho National Lab, all prior to the SEC investigation halting business.

(9).  **Restructuring Transactions**: These transactions, executed almost exclusively in BROV, with some in Mexico, involved eliminating unavoidable financial and/or  accounting losses tied to the necessity of liquidating assets.  The total nominal value of these transactions likely exceeds $3 billion, and the Receiver is in possession of evidence confirming these transactions as well.

These examples support the Defendant's position that he did not operate a Ponzi scheme, and this nomenclature is inapplicable to the fraud to which Illarramendi pled guilty. This Court should resist the Government's effort to foreclose any potential set-off that might mitigate Mr. Illarramendi's sentence, by failing to credit him for non-fraud related set-offs and returns to investors, including PDVSA, long before any arrest was made in this case.

Essentially, the Receiver is hard pressed to deny the significant financial value generated in legitimate transactions executed by the Receivership entities, or the sheer scope and breadth of legitimate operations, including not only financial market and advisory services, but also, and by way of example, renewable and non-renewable energy, health care, and transportation.  This work is all documented, and the Receiver is well aware of the same, in spite of continuing efforts to characterize Mr. Illarramendi's work as a giant Ponzi scheme.

Notably, in meetings and recorded proffer sessions, it is very clear that Mr. Illarramendi reviewed all of the aforementioned transactions with not only the Receiver, but also, at various different times, the SEC, the FBI, and U.S. Representatives in more than one jurisdiction.  The Court may take judicial notice of filings by the Receiver in the civil cases, acknowledging and

confirming many of these transactions.  In fact, in civil cases before this Court, there is ample

evidence highlighting transactions totaling hundreds of millions of dollars in monetary value,

which have generated tens of millions of dollars in legitimate revenues.  The Ponzi scheme label

is inapplicable, and is being superimposed on Mr. Illarramendi's conduct in an unwarranted

manner.  Mr. Illarramendi did not operate a Ponzi scheme, and the Government cannot simply

ignore evidence that mitigates against this position.

### d.  BROV Corruption, and the Single Power Phenomenon

While the VEB/USD currency arbitrage mechanism developed by Mr. Illarramendi at CS

eventually set the standard in the industry, the lucrative nature of the mechanism also bred

corruption.  In turn the corruption in assignments, and extortionate demands for greater portions

of large profits and kickbacks, created a hostile and dangerous business environment.  This

backdrop must be acknowledged to avoid a completely skewed picture of Mr. Illarramendi's

offense conduct.  Without an understanding of the de facto environment within which Mr.

Illarramendi was operating, a first glance look lends itself to a much bleaker view of Mr.

Illarramendi's actions.  Important features of the backdrop against which Mr. Illarramendi's

activities are most fairly viewed, include, but are not limited to:  (1) The singularity of the

BROV and PDVSA, (2) extortion, bribery, corruption, forming an integral part of Government

dealings in the BROV, and (3) the VEB/USD exchange rate systems and the effect of official

and parallel currency markets.

### (i)  Singularity and Corruption

In order to fully understand important details of this case, operative at the time of Mr.

Illarramendi's alleged conduct, it is essential to grasp two fundamental realities defining then

present-day Venezuela:

(1) **Single Voice Single Power**:  Unlike in the United States, there is no de facto separation between governmental branch action, or separate source controls for money usage among governmental entities in Venezuela.  The Executive branch, through the Treasurer of the Republic, managed and dictated all budgetary appropriations and expenditures, irrespective of appropriations bills, which may have originated in the National Assembly (legislative body).  This mirrored the well known de facto political situation in Venezuela during the relevant periods in this case; namely, that since 1998, President Hugo Chávez Frías, with the assistance of his "party, operated as the sole voice and power in the BROV.

(2) **BROV:  Officials with License to Steal**: Over the past ten years, extortion at all levels of government, especially the financial sectors, has permeated the BROV.  Any individual or other institution hoping to accomplish anything related to the Government (not limited to business transactions, but civil registry matters, permits, registrations, etc.), would ultimately encounter forced compensation to public officials for even the simplest requests.  The Venezuelan Government is perceived by many to have become a worldwide criminal enterprise.  Those whose paths lead them to being under government control, are essentially beholden unto a code of silence, and a "do as you're told or else" mandate.

Evidence of these two realities is captured regularly in the media, international organization

reports, political debates, and elsewhere.[12]

---

[12] See. e.g., Michael Sauter, *The Most Corrupt Countries In The World*, USA Today, Jul.14, 2013, *available at* http://www.usatoday.com/story/money/business/2013/07/14/most-corrupt-countries/2512785/; David Glovin & Charlie Devereux, *Venezuelan Corruption Cases In U.S. Spotlight Chavez Officials*, Bloomberg.com, Dec.9, 2010, *available at* http://www.bloomberg.com/news/2010-12-09/venezuelan-corruption-cases-in-u-s-courts-put-spotlight-on-chavez-regime.html;William Neuman, *Miami Workers Bribed, and Shortchanged, Venezuelan Banker, U.S. Says*, nytimes.com, May 21, 2013, *available at* http://www.nytimes.com/2013/05/22/world/americas/venezuelan-banker-and-miami-brokerage-workers-are-accused-of-fraud.html?pagewanted=all&_r=0;l;  U.S. Department of Justice, *Two U.S. Broker-Dealer Employees and Venezuelan Government Official Charged in Massive International Bribery Scheme*, FBI.com, May 07, 2013, *available at* http://www.fbi.gov/newyork/press-releases/2013/two-u.s.-broker-dealer-employees-and-venezuelan-government-official-charged-in-massive-international-bribery-scheme;  Arthur Brice, *Least corrupt place? New Zealand. Worst? Somalia, North Korea*, CNN.com, Dec. 5, 2011, *available at* http://www.cnn.com/2011/12/03/world/corruption-perceptions-index/index.html?iref=allsearch (Venezuela essentially occupying position of most corrupt regime in the Western Hemisphere);  *Hugo Chavez: King of Corruption*, Investors.com, Dec. 06, 2012, *available at* http://news.investors.com/ibd-editorials/120612-636089-venezuela-ranks-

Furthermore, our own Government has recently chimed in on the chaos that pervades the BROV, further supporting Mr. Illarramendi's claims that he was subject to extortion, threats and violence, in a country pervaded by corruption.  The Venezuela Defense of Human Rights and Civil Society Act, enacted in December 2014, stands for the very clear proposition that our own Government not only recognizes, but also seeks to sanction, the conduct of the BROV and its officials.  In no uncertain terms, the Act acknowledges rampant BROV corruption and related violence.[13]

PDVSA, which is for all intents and purposes the BROV, is owed millions of dollars making up the loss asserted by the Government.  As set forth hereinafter, the Defense's position is that PDVSA has already been unjustly enriched by the Receiver's distribution of approximately $100 million;  in reality, less than half that amount could satisfy repayment of the entire PDVSA claim, even if Mr. Illarramendi were not credited for any other Guideline sanctioned set off.   See infra, this Memorandum, Part II, (d)(ii) (examining effects of the exchange rates upon the PDVSA claims in the context of calculable loss).[14]

Noteworthy also, is the relationship between PDVSA and its "in house" insurance provider.  Normally, in most corporations, pension funds operate independently of the management of the company and respond to a Board, or other type of governing body named by

tops-in-corruption-in-hemisphere.htm; U.S. Department of State, Venezuela 2013 Human Rights Report, 2013, available at http://www.state.gov/documents/organization/220689.pdf (all attached hereto as Exhibit 4, except Venezuelan Human Rights Report 2013, published by U.S. Dept. of State).

[13] Pub. L. No. 113-278, S-2142 (113th), enacted Dec. 18, 2014 (attached hereto as Exhibit 5).
[14] Ironically, if this Court were to ignore Defendant's arguments on calculable loss, with respect to the effect of Venezuelan law, and varying exchange rates, the consequence would clearly be the unjust enrichment of a regime that our own Government seeks to sanction for the very reasons Mr. Illarramendi has been attempting to communicate to the Government from the inception of this case.

the affiliated individual employees and retirees of the company.  Captive or in-house insurance companies, however, usually also have a governance structure that is separate from the executive management of its parent.  In most cases, there are specific statutes which insulate against potential conflicts of interest, or situations where parent company management desires to use pension fund assets to fund company activities--essentially "doubling up" the risk of insolvency for the underlying entities.

For PDVSA, mainly because of the "single power" reality described above, the exact opposite is true.  Underlying entity management decisions are made by identical individuals, who respond exclusively to the sole shareholder (BROV), via direct interaction with the Treasurer of the Republic.  This situation represents a complete unification of financial decisions.  From a financial standpoint, PDVSA acts in concert with, and under direct and immediate control of the BROV Treasurer.  Notably, the Treasurer, answers solely to the President (Chávez at all times relevant hereto).  For all intents and purposes the regime (BROV) and PDVSA are one in the same.

Officials use their unbridled power to obtain huge personal gains by deploying well known intermediaries, a phenomenon facilitated readily by the "license to steal" aspect of government operations in the BROV.  Once again, it is also difficult to imagine how the Receiver and/or the Government could deny the effect of this phenomenon, and fail to recognize the multitude of specific transactions involving such well known intermediaries.  Records of these transactions confirm exactly what Mr. Illarramendi has maintained in proffer sessions; namely, that his attempts to cure the shortfalls were further stifled by the siphoning of otherwise anticipated profits by Government officials, via extortionate means.  Mr. Illarramendi's obvious expertise in the VEB/USD arbitrage made him an attractive target for this type of corruption;  he

understood the transactional nuances and was forced to operate as a pawn for the benefit of Government officials since 2005.

To the extent that corruption, extortion, and self-dealing within the BROV and PDVSA are acknowledged at all by this Court, there is a clear sense in which the PDVSA arrives on the claim scene with unclean hands.  Essentially, PDVSA is claiming to be owed money which its officials, acting through well-identified intermediaries, already received from MK:  (1) in lieu of the funds it was supposed to integrate into the Pension Fund, and (2) pending the development of the additional value that MK was intending to generate through its investments.  The siphoning eroded the Receivership entities' profitability.  Prior to ruling on the ultimate losses in the case at bar, this Court is urged to confirm the existence of evidence supporting the effect of extortion and siphoning, and determining the effect the same bears upon ultimate loss calculations, and the legitimacy of the current PDVSA claim.  Actions of the BROVa nd PDVSA, of which the Receiver is well aware, eroded not only the Receivership companies' profitability, but also, albeit in what was supposed to be a temporary event, its base principal[15].

Suffice it to say, both the "single power" and "license to steal" realities converge to influence key elements of this case.  It is difficult to imagine how the Government could deny[16] that PDVSA and its sole shareholder, the BROV, is staffed by officials who have contributed to the alleged accounting "shortfall" through a systematic, government sanctioned, nest feathering, that represents the norm and not an exception inside this regime.

---

[15] In his lawsuits, the Receiver's filing alleged more than $490 million in these types of payments.  This amount is higher than the total allowed amount of PDVSA claims in the Receivers distribution plan.

### (ii). The Exchange Rates:  "Permuta" Plus Parallel and Emerging Official Markets

Since 2002, the convertibility and market for the bolivar has been under full control of

the Venezuelan Government's ferrous and restrictive exchange control system.  The key

characteristics of the system, ab initio,  included (1) a government fixed BVD/USD exchange

and (2) limits upon access to U.S. dollars at this official rate for the Venezuelan private sector--

with U.S. dollars effectively available at an official exchange rate, solely for certain basic needs

such as food and medicine.  Due to the system's negative economic effects, the BROV allowed

the development of the so called "permuta" market where, via the exchange or permutation of

bolivars and U.S. dollar denominated securities, private sector entities could trade dollars freely,

but at a much higher exchange rate than the official rate.

Paralleling the exchange and permuta situation, the BROV experienced a crippling

countrywide strike in 2002.  Consequently, the cost of funding for Venezuela in international

markets skyrocketed.  As previously noted, Mr. Illarramendi led a team at CS, that developed the

VEB/USD currency arbitrage market, which allowed the Government to finance itself at a much

lower interest rates than those offered by the market, while at the same time provided a much

needed escape valve to the currency markets.  Essentially, local investors could purchase U.S.

dollar denominated securities issued by the BROV, by using bolivars at official exchange rates.

These bonds were issued with a lower interest rate than required by the international markets,

forcing the purchasers to sell the bonds at a discount in U.S. dollars.  The effect of this arbitrage

mechanism was: (1) the Government would save significant funding costs, and (2) the private

sector in Venezuela effectively obtained U.S. dollars at an exchange rate that was higher than the

official exchange rate, but much lower than the permuta exchange rate.  Shortly after the

development of this mechanism, the BROV began selling all of its financial assets in this

manner.  The results of this over the last 12 years for the Venezuelan market has been the realization of at least $60 billion in financial benefits for both public and private sector entities.

As part of the exchange controls PDVSA, as the largest U.S. dollar generating aspect of the BROV, was obligated to sell all generated dollars to the Venezuelan Central Bank at the official exchange rate.  It is essential to read PDVSA's current claims against this backdrop.

Between 2009 and 2010, as part of a campaign to nationalize certain assets of the financial sector, the BROV cracked down on what it characterized as an abuse of the Permuta Market by a group of private sector broker dealers.  This crackdown imposed significant new restrictions on private sector access to foreign currency.  These restrictions were in place until 2013 and early 2014 when, in light of falling oil prices and the need for economic stimulus, the Government established what is now known as the alternative exchange rate trading system or the SICAD I and SICAD II.  See discussion, infra, Part III, pp. 57-60 (outlining applicable BROV laws and exchange rate application to the Government's alleged calculable loss).

The SICAD II is essentially a regulated free market, in which public and private sector entities can purchase and sell U.S. dollars at rates of approximately 50 bolivars to a single U.S. dollar.  Id.  This rate is almost nine times higher than the current official exchange rate of 6.30 VEB per USD, and twelve times higher than the 4.30 VEB per USD exchange rate at the that PDVSA acquired it's claim rights against the Receivership in December 2011.  Because of this overall exchange control system, PDVSA has a unique advantage that provides it with a significant twelvefold windfall for any payments made, or about to be made to it, by the Receivership.

In short, the entire allowed amount of PDVSA's claim, listed by the Receiver at a total of $482 million, was acquired by PDVSA based on Venezuelan law governing the purchase of the

claims, using the bolivar at the official exchange rate of 4.30 bolivars per USD.  Therefore, in order for PDVSA to avoid a loss it would need to be paid an approximate total of $42 million by the Receivership.  See discussion, infra, Part III, pp. 57-60 (outlining applicable BROV laws and exchange rate application to the Government's alleged calculable loss).

### III.  Advisory Guidelines & Particularized Sentencing Requirements

Judicial Authority in Sentencing is no longer limited by absolute adherence to a mandatory Sentencing Guideline schema; in short, the Federal Sentencing Guidelines are *advisory* in nature, and afford the Court a new discretionary authority in sentencing emanating from Supreme Court decisions in Blakely v. Washington, 124 S. Ct. 2531 (2004), United States v. Booker, 125 S. Ct. 738 (2005), United States v. Fanfan, 125 S. Ct. 738 (2005), and reinforced by the Second Circuit in United States v. Crosby, 397 F. 3rd 103 (2d. Cir. 2005).  Under traditional Guideline analysis, a sentencing Court was obligated to "impose a sentence of the kind, and within the range, referred to in subsection (a) (4) unless the Court [found] that there exist[ed] aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . .."  18 U.S.C. §3553(b)(1).  Booker and its progeny effectively excises this provision from the statutory schema, holding that a Sentencing Court must also consider the other factors enumerated under Section 3553(a).  See Booker, 125 S. Ct., at 757.  Ultimately, a *post* Booker sentence could be based upon a particularized and individualized analysis of the requisite factors.  As stated in United States v. Ranum, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005), District Courts "must [now] consider all of the applicable factors . . . and sentence the person before them as an *individual*."  Id. (emphasis added).

The Second Circuit adopts the sentencing particularity requirement, confirming that the applicable Guideline ranges are only one factor, among others, which the Court must consider.

The Sentencing Court must consider "all of the other factors listed in section 3553(a) [and in so doing] . . . the resulting sentences will continue to substantially reduce unwarranted disparities while [also achieving] more individualized justice."  United States v. Crosby, 397 F. 3d 103, 114; accord, United States v. Canova, 412 F. 3d 331, 350-51 (2d Cir. 2005).   As outlined procedurally by the Second Circuit:

> First, the Guidelines are no longer mandatory.  Second, the sentencing judge must consider the Guidelines and all other factors listed in section 3553(a).  Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of the applicable policy statements.  Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors . . . whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.  Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Crosby, supra at 113.  Following this procedure, the Court can impose a sentence within the Guideline range, or impose a non-Guideline sentence based upon the other factors set forth in 18 U.S.C. § 3553, including circumstances of the offense, history and characteristics of the Defendant, the need to reflect seriousness, the promotion of respect for the law and provision of just punishment, the need for deterrence, protection of the public from further crimes that might be committed by the Defendant, the provision of educational or vocational training, medical care or other correctional treatment, the need to avoid unwarranted disparity in sentencing, and the need to provide restitution to victims.  See generally, Booker, supra at 756-757.

Courts are free to justify a sentence outside of a Guideline range without citing factors which remove a case from the "heartland," or based upon a strict adherence to standards for pre-Booker Guideline departures.  See e.g., United States v. Ranum, supra at 987 (stating that Courts are free to "disagree in individual cases and in the exercise of discretion, with the actual range

26

proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by the reasons tied to the § 3553(a) factors."); and also United States v. Long, 2005 U.S. App. LEXIS 21699 *17 (7th Cir. October 7, 2005) (stating that factors which were previously discouraged as departure bases may now be considered absent extraordinary circumstances, including race, sex, military, civic, charitable, or public service, prior good works, lack of youthful guidance, drug abuse and addiction, etc.).  As noted in Ranum, supra at 986, section 3553(a)(1) considers a wide array of "history and characteristics of the defendant" previously prohibited or limited by the Sentencing Guidelines.  Indeed, the Guidelines' "prohibition of considering these factors cannot be squared with the Section 3553(a)(1) requirement that the Court evaluate [such] history and characteristics."  Id.  Moreover, where a Defendant's "history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range."  See United States v. Myers, 353 F.Supp.2d 1026,1028  (S.D. Iowa, 2005).,

As explained by the Second Circuit, in United States v. Dhafir:

> In Booker, the Supreme Court held that the Sentencing Guidelines are effectively advisory, and that a District Judge has the discretion to chose to impose either a Guidelines or a non-Guidelines sentence [543 U.S.] at 245.  Subsequently, in *Gall v United States*, 128 S.Ct. 586 (2007), the Court clarified that "a District Court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency the Guidelines should be the starting point and the initial benchmark."  Id. At 596 (citations omitted) . . .  The Court has since added that "as a general matter, courts may vary based solely on policy considerations including disagreements with the Guidelines." *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007) (internal quotation marks omitted)."

Dhafir, 577 F.3d 411, 413-14 (2d Cir. 2009)(citations omitted).  Notably, the only limiting factor that the Court ought to consider in the context of sentencing the Defendant emanates from the statutory schema itself;  as stated in the introductory portion of § 3553(a), the "[c]ourt shall impose a sentence sufficient, but not greater than necessary," to serve the fourfold purpose of

subsection (a)(2).  Namely, the goals of punishment, deterrence, protection of society, and rehabilitation. Outside of this, the post Booker schema requires a sentencing Court to at least look outside of the Guidelines, with the caveat that presumptions regarding the correctness of the Guidelines are to be avoided; "the greater the weight given to the Guidelines, the closer the Court draws to committing the act that Booker forbids."  See Simon v. United States, 361 F. Supp. 2d 35, 40 (E.D.N.Y., 2005).

Here the Court is free to, and certainly ought to impose a non-Guideline sentence upon Mr. Illarramendi.  While a District Court should begin all sentencing proceedings by correctly calculating the applicable Guideline range, they are merely a "starting point and the initial benchmark . . . not the only consideration."  See Gall v. United States, 128 S.Ct. 586, 596 (2007).  Rather, the Court must consider all of the § 3553(a) factors" and "make an individualized assessment based upon the facts presented."  Id.  596-97.  "[D]istrict Court[s] enjoy considerable discretion in identifying the grounds that can justify a non-Guideline sentence.  See U.S. v Jones, 531 F 3d, 163, 172 (2d Cir. 2008).  In fact the Court may even "vary from Guideline ranges based solely on public policy considerations, including disagreement with the Guidelines."  Kimbrough v. United States, 552 U.S. 85, 101 (2007) (internal citations omitted).  Even upon Appellate review, a Guideline range sentence enjoys no presumption of reasonableness.  See e.g., U.S. v Fernandez, 443 F 3d 19, 28 (2d Cir. 2006).

**V.  Advisory Guideline Calculation:  the PSR versus Defendant's Calculations:**

Based on the November 1, 2011, Guidelines manual, Mr. Illarramendi's advisory guidelines are currently calculated by the Probation Department as follows:

Base Offense Level                              USSG. §2B1.1                    <u>7</u>

<u>Specific Offense Characteristics</u>

| | | |
|---|---|---|
| i)  Loss between $200 and $400 million | USSG §2B1.1(b)(10)(O) | +28 |
| ii)  Scheme outside of U.S./sophisticated | USSG §2B1.1(b)(10)(B) | +2 |
| iii)  Investment Advisor enhancement | USSG. §2B1.1(b)(18)(A)iii | +4 |
| iv)  Obstruction of Justice | USSG §3C1.1 | +2 |
| | TOTAL: | 43 |

No upward adjustments or enhancements are calculated for Role in the Offense, Victim Related Adjustments, and/or Greater than 10 Victims, therefore, "0" points are assigned to the same. In addition, no credit or reductions for Early Acceptance of Responsibility are reflected, and therefore, "0" points are subtracted from the overall total. Based primarily on the 28 point increase attributable to the alleged "loss," Mr. Illarramendi faces life imprisonment.

The Defendant argues that the loss enhancement is erroneous, and that he has demonstrated good faith in providing information to the Government, and in a timely manner he has Accepted Responsibility for the offense(s). Further, as the same is more specifically outlined hereinafter, that his advisory Guideline total is subject to double counting and "piling on," arguments, and that he nonetheless is a candidate for downward departure. What follows is Defendant's position on the most appropriate Guideline calculation, followed thereafter by the non-Guideline Sentence alternative.

**a.  Base Offense Level**

Counts One, Two, Three and Four, as set forth in the Indictment, are grouped pursuant to U.S.S.G. §3D1.2(d). Pursuant to U.S.S.G. §2B1.1, the base offense level in this case is 7. This aspect of the Guideline calculation is the least contested, and the Defendant agrees that the post-grouping base offense level is 7.

### b.  **Obstruction of Justice Adjustment Should not Apply**

Pursuant to U.S.S.G. §3C1.1, where a defendant willfully obstructs or impedes, or attempts to obstruct or impede, "the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense" the Court may increase the offense level by 2 levels.  With respect to obstructive conduct that takes place prior to the start of the investigation of the "instant offense of conviction" such conduct must be "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  See  U.S.S.G. §3C1.1, cmt. 1.

The burden of proving the facts that support the application of this adjustment is on the Government, and the standard for proving such facts is generally a preponderance of the evidence.  See U.S. v. Archer, 671 F.3d 149, 161 (2d Cir.2011).  Prior to imposing this 2 level adjustment "the district court must find that the defendant consciously act[ed] with the purpose of obstructing justice."  U.S. v. Pena, 751 F.3d 101, 105 (2d Cir.2014) citing U.S. v. Agudelo, 414 F.3d 345, 349 (2d Cir.2005).  "The intent to obstruct must be unambiguous."  Id., citing U.S. v. Kelly, 147 F.3d 172, 178 (2d Cir.1998).  Thus conduct that may appear to be obstructive "may not result in sentence enhancement unless it is willful."  U.S. v. Altman, 901 F.2d 1161, 1164 (2d Cir.1990), citing U.S. v. Stroud, 893 F.2d 504, 507 (2d Cir.1990).  The defendant must be found to be acting "with the purpose of obstructing justice."  Id.

In the present case, the PSR suggests that an enhancement for Obstruction of Justice is appropriate based on Mr. Illarramendi's conduct prior to the FBI investigation and after the entry of his guilty plea.

With respect to his pre-plea conduct, whatever "obstructive" behavior Mr. Illarramendi may have engaged in, it was certainly not connected with (or aimed at) "the investigation, prosecution, or sentencing of the instant offense of conviction" or a "closely related offense." See U.S.S.G. §3C1.1. cmt. 1.  In fact, once the investigation of the current offenses began, Mr. Illarramendi volunteered to meet with the FBI and truthfully disclosed his actions.  Simply put, Mr. Illarramendi's fraudulent activity was aimed at hiding the poor performance of the funds he managed as opposed to "consciously act[ing] with the purpose of obstructing justice."  See Pena, supra at 105.  At the very least, there exists a degree of ambiguity in his conduct which precludes a finding (even by preponderance of the evidence) that he acted with the intent to obstruct the instant investigation and prosecution.  Id.

With respect to his post-plea conduct, the PSR makes much to do about a state tax return that was paced into Mr. Illarramendi's wife's account at TD bank, and payments allegedly made by Mr. Illarramendi from this account to his lawyer, and for household expenses.  However, the PSR, for the most part, bases this claim conjecture rooted in the assumption of certain facts.  For instance, the joint tax return is being treated solely as the property of Mr. Illarramendi and does not account for his spouse's use.  The PSR assumes that Mr. Illarramendi had control of the funds, even though they were deposited in his wife's bank account.  Moreover, while Mr. Illarramendi previously executed a form (at the request of the Receiver in the SEC action) that allowed the IRS to take custody of his tax refund in order to allow the Receiver to determine what to do with the assets, he was never asked to execute such a form for his state tax refund, and there is no indication or evidence that suggests that Mr. Illarramendi knew that he and his wife's state tax refund would or should be treated similarly.

Even if taken at face value, the allegations in the PSR still do not supply the kind of evidence that would justify an enhancement under U.S.S.G. §3C1.1.  Mr. Illarramendi's conduct has nothing to do with "the investigation, prosecution, or sentencing of the instant offense of conviction," or a "closely related offense."  See  U.S.S.G. §3C1.1. cmt. 1.  The amount of money received or spent as result of the tax refund, or Mr. Illarramendi's untimely disclosure of same, does not bear upon the current offenses.  It does not cover up his prior actions, it does not cover up the extent of harm, if any, caused by his offense conduct, and it does nothing to add or subtract from what he already did and pled guilty to.  While the government may believe that it gives rise to some new offense, it would still be a new and unrelated offense, based on Mr. Illarramendi's alleged misrepresentations in an application for Court appointed counsel, or the purported violation of a civil restraining order in the civil case.  Simply put, Mr. Illarramendi should not be punished for crimes that the Government "believes" he committed in the context of the instant offenses to which he has already pled.  There is no evidence whatsoever that Mr. Illarramendi's actions in using the tax refund in any way affected the instant prosecution, or were his actions were calculated to impede same.

### c. Defendant is Eligible for Acceptance of Responsibility Adjustment

#### (i)  Eligibility based on 3E1.1(a)

Pursuant to U.S.S.G. §3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  In deciding whether a defendant qualifies for this 2 level adjustment, the courts consider multiple factors, including defendant's truthful admissions of the conduct comprising the offenses of conviction, Defendant's voluntary assistance to the authorities, and timeliness of acceptance of

responsibility.  See U.S.S.G. §3E1.1, cmt. 1(A)-(H).  Moreover, "entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which [the defendant] is accountable . . . will constitute significant evidence of acceptance of responsibility."  U.S.S.G. §3E1.1, cmt. 3.  Simply put, "the paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits the conduct comprising the offense or offenses of conviction . . . in a sufficiently timely manner so as to avoid a lengthy trial and avert the risk of an irrational verdict."  U.S. v. Kumar, 617 F.3d 612, 637 (2d Cir.2010).  While a guilty plea does not automatically entitle a defendant to this adjustment, "a defendant who pleads guilty is routinely afforded a sentence reduction for acceptance of responsibility."  U.S. v. Fisher, 38 Fed.Appx. 39, 41 (2d Cir.2002);  see also, United States v. Rogers, 972 F.2d 489, 493 (2d Cir.1992).

     In the instant case, Mr. Illarramendi contacted the FBI when in the early stages of the investigation, and he requested a meeting.  At the meeting, Mr. Illarramendi detailed and explained to the FBI his "scheme" to disguise the poor performance of the funds he managed.  Mr. Illarramendi further admitted that, during the SEC investigation, he tried to cover the "hole" in the existing hedge fund assets by creating fictitious assets on paper with the aid of two other individuals, Juan Carlos Horna Napolitano and Juan Carlos Guillen Zerpa.  Moreover, subsequent to this confession, Mr. Illarramendi rendered substantial aid to the FBI and USAO, by participating in meetings with Mr. Guillen and Mr. Horna during the FBI's investigation of these individuals, who, unlike Mr. Illarramendi, continued to obstruct justice.  Consequently, both Mr. Horna and Mr. Guillen were arrested by the FBI on March 3, 2011.  Mr. Illarramendi chose not to needlessly put the Government to its burden of proof at trial and pled guilty before

this Court on March 7, 2011.  Clearly, Mr. Illarramendi withdrew from the otherwise conspiratorial conduct with these two men, and thwarted the potential for any obstruction of justice.

Notably, at the time Mr. Illarramendi entered into the plea agreement the Government agreed to recommend a 2 level adjustment for acceptance of responsibility.  See Plea Agreement, March 7, 2011, at pp. 5-6.  Therefore, his prior conduct was not considered to form a basis for withholding an Acceptance of Responsibility reduction.[17]  Mr. Illarramendi's voluntary disclosure, assistance to the Government, and speedy acceptance of responsibility by way of a guilty plea make him a prime candidate for a 2 level downward adjustment under U.S.S.G. §3E1.1(a).  Mr. Illarramendi acted "in a sufficiently timely manner" by contacting the authorities when their investigation was only at its starting stages and further acted so as to "avoid a lengthy trial and avert the risk of an irrational verdict."  See Kumar, at 637.

## ii) Eligibility based on 3E1.1(b)

To the extent that this Court determined an Advisory Guideline calculation to be 16 or above, prior to the application of the two point Early Acceptance reduction, the Defendant would presumably qualify for another one point reduction pursuant to U.S.S.G. §3E1.1(b), on Motion by the Government.  If the Defendant's position on Acceptance of Responsibility is adopted,

---

[17] Notably, it is only at the time of Probation's Guideline calculation in the PSR, that the Obstruction of Justice enhancement mentions pre Plea Agreement conduct as a basis for an enhancement—and then, only one of two possible reasons for the enhancement.  The PSR states "the Defendant conspired with others to obstruct," by creation of fictitious asset verification letter "as well" as "obstructive behavior while on pre-trial release."  PSR at p. 16, ¶ 58.  Only the latter basis, therefore, would be a proper basis for depriving Mr. Illarramendi of his bargained for point reduction for Acceptance.  This basis, however, does not appear to justify this deprivation as it does not pertain to the obstruction of justice in relation to the instant offense(s).

along with the position that the §3C1.1 enhancement for Obstruction does not apply, he would qualify for the additional reduction.  Pursuant to U.S.S.G. §3E1.1(b), "if defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level."

While the Government has reservations about the Defendant's Acceptance proper, and will likely argue that this fact, along with the Obstruction enhancement, makes Mr. Illarramendi ineligible, this Court has discretion to find that the enhancement does not vitiate the Defendant's reduction eligibility.  U.S.S.G. 3E1.1, cmt. at n.4, states that while a 3C1.1 enhancement "ordinarily indicate[s] the Defendant has not accepted responsibility," there can be "extraordinary cases in which adjustments under both . . . may apply."  Id.  Here, Mr. Illarramendi pled guilty, by way of Complaint, and has never sought to take back his guilty plea. He notified the authorities of his intent to plead guilty early, and has met with authorities to provide substantial assistance on multiple occasions.  He has certainly spared the Government the resources necessary to prosecute him at a Trial.  The Government can easily determine whether the Defendant's notification of intention to plead was sufficiently timely to alleviate the burdens of trial preparation upon the Government.

In addition, the Second Circuit has rejected an outright exercise of prosecutorial discretion linked to "any rational basis" for withholding the extra point reduction, in spite of the multitude of "sister Circuits" that hold otherwise based on the inclusion of permissive "upon

motion," language.  See United States v. Lee, 653 F3d 170 (2d Cir. 2011), citing United States v. Divens, 650 F3d. 343, 344 (4th Cir, 2011) (adopting in the Second Circuit the Divens interpretation of 3E1.1(b) that the guideline benefit cannot simply be withheld based on prosecutorial discretion pointing to any rational basis).  The Court should follow the proposal of at least one insightful law student scholar who advocates a "modified" Divens approach, calling for a two pronged analysis that begins with a determination of whether the Defendant timely notified the Government of his intention to plead guilty, in a way to sufficiently alleviate trial preparation burdens and resources.  If Government concludes the notification was given in such a manner, it must make the Motion for the reduction.  See Alexa Chu Clinton, *Taming the Hydra;  Prosecutorial Discretion Under the Acceptance of Responsibility Provision of the US Sentencing Guidelines*, 79 Univ. of Chicago Law Rev., 1467, 1469, (January 11, 2013).

Notably, Mr. Illarramendi's calculable loss posture has nothing to do with his acceptance of responsibility, and as argued below, his stipulation to a potential loss amount at the time of plea was not based on a full understanding of the Guideline rules and case law attendant upon the legally recognized definition of loss, or the recognized calculation of loss for Sentencing purposes.  He would otherwise be entitled to a loss determination based on the applicable standards of proof;  the fact that an enhancement aspect is being disputed, doesn't mean Mr. Illarramendi has failed to accept responsibility.  Consequently, he should be entitled to both reductions.

### d.  Applicable Downward Departures

The Court may depart from the applicable Guideline range if "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance."  U.S.S.G. §5K2.0(a)(1)(A).  Moreover, the Court can always elect "not impose a Guidelines sentence, and

may, if doing so would be reasonable, lower the sentence below the Guidelines range even when a downward departure is unavailable." U.S. v. Brady, 417 F.3d 326, 333 (2d Cir.2005). Ordinarily, it is the defendant that "bears the burden of proving that he or she is entitled to a downward departure." U.S. v. Cotto, 347 F.3d 441, 445 (2d Cir.2003). It should further be noted that, in some circumstances, a "severe sentence" based on upward adjustments, "imposed because of facts found under a 'preponderance of the evidence' standard, may justify a downward departure." See U.S. v. McLeod, 251 F.3d 78, 82 (2d Cir.2001); see also U.S. v. Gigante, 94 F.3d 53, 56 (2d Cir.1996).

One of the grounds for a downward departure contemplated by the Guidelines (and having direct applicability to this case) is a voluntary disclosure of the offense by the Defendant. See U.S.S.G. §5K2.16. Specifically, such a departure is warranted where "the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and… such offense was unlikely to have been discovered otherwise." U.S.S.G. §5K2.16. While ordinarily the Defendant bears the burden of proof on eligibility for a downward departure, at least one court in this Circuit shifted the burden to the Government to prove that the offense was "likely" to have been discovered otherwise. See U.S. v. Rivera, 262 F.Supp.2d 313, 315 (S.D.N.Y. 2003). Moreover, "voluntary disclosure" in and of itself may be sufficient for a downward departure. See U.S. v. Jones, 158 F.3d 492, 502 (10th Cir.1998) ("While not falling squarely within the departure provision [of § 5K2.16], we cannot conclude the inevitable discovery of [the defendant's] offense somehow transforms his nonetheless voluntary disclosure into an impermissible basis for departure.").

In the present case, Mr. Illarramendi met with representatives from both the Bridgeport and Boston US Attorney's offices and FBI agents over forty times. These meetings averaged

between 2 and 4 hours each. He agreed to discuss any and all topics at the FBI or USAO's request and answered all questions truthfully, to the best of his ability and recollection.  Mr. Illarramendi further turned over all potential evidence in his possession (such as emails and various documents) to the FBI and helped translate or interpret documentation.  He further assisted FBI agents in their investigation and the eventual arrest of Juan Carlos Horna Napolitano and Juan Carlos Guillen Zerpa.  Essentially, Mr. Illarramendi did everything possible to voluntarily disclose and accepts responsibility for his offenses.  It is highly unlikely that the Government would have been able to uncover the exact nature and extent of these offenses without his assistance.  Consequently, Mr. Illarramendi is a prime candidate for significant downward departure pursuant to U.S.S.G. §5K2.16.  See e.g., U.S. v. Gjoka, 526 Fed. Appx. 56, 59 (2d Cir. 2013) (illustrating Guidelines sentence which exceeded 40 years' imprisonment reduced to 100 months based on defendant's assistance to the government).

Another ground for departure is set forth in U.S.S.G. § 5K2.12, pursuant to which an applicable guidelines sentence can be reduced "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward."   The degree of departure is commensurate with the "reasonableness of the defendant's actions . . . proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be." See U.S.S.G. § 5K2.12.  Departure is typically warranted departure when the coercion "involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency."  Id.  The defendant need only making "an objective showing that a reasonable person would have been coerced under the

particular circumstances of the defendant's case."  See U.S. v. Cotto, 347 F.3d 441, 446 (2d Cir. 2003).

Here, the initial loss of funds or assets that precipitated the instant offenses was spurred on by the actions of Venezuelan officials, intent upon making a profit.  The subsequent cover up by Mr. Illarramendi was a further product of this coercion.  As explained, the threats and extortion took place in the context of an extremely corrupt and violent regime.  Mr. Illarramendi was informed that direct threats were made against his life.  Mr. Illarramendi had to comply with the demands of the corrupt Venezuelan officials, and could not disclose the loss to the funds under his management for fear that such disclosure would directly implicate the same individuals who made threats against him and his family.  In light of the surrounding circumstances, it cannot be said that a reasonable person in Mr. Illarramendi's shoes would not have succumbed to similar coercion.  Thus, there is ample reason for this Court to depart from the applicable guideline sentence under  U.S.S.G. § 5K2.12.

### e.  Loss Adjustment:  Loss is Zero Applying Recognized Calculation Method

#### (i)  Calculable Loss in General

The USSG recognizes that loss determination is complicated, and that Courts can estimate rather than determine loss with an "accountant's precision."  See USSG §2B1.1, cmt. n.3(c),  and also United States v. Guang, 511 F.3d 110, 123 (2d Cir. 2007) ("A district court need not establish the loss with precision but rather need only make reasonable estimate of the loss, given the available information");  accord United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007).  But our law does not tolerate outright guesswork, and operative standards are a necessary component of an appropriate sentence.  For example, a margin of error that is 40% or more is not a "reasonable estimate," but more like a sheer stab in the dark, constituting an arbitrary,

unsatisfactory and ultimately unlawful basis upon which to deprive a Defendant of his freedom. See United States v. Scheele, 231 F.3d 492, 499 (9th Cir. 2000) (like "loss," the USSG permits drug quantity to be estimated; but where court estimates, it must consider the margin of error in its methodology before determining quantity). And with the stakes as high as they are in Fraud cases where amounts of loss can lead to life imprisonment, the standard of proof applicable should be commensurate with the exposure.

Essentially, a Court must guard against loss figures assigned "arbitrarily," or through a process devoid of factual findings supporting the loss alleged. The Court must develop some evidence to support the loss figure, rather than simply settling on a number. See United States v. Drayer, 364 F. App'x 716, 720-21 (2d Cir. 2010) (remanding for resentencing where the application of the guidelines is heavily dependent on factual findings and "the absence of a developed record affords no basis for meaningful review"); United States v. Renick, 273 F.3d 1009, 1027 (11th Cir. 2001); United States v. Oseby, 148 F.3d 1016, 1025-1027 (8th Cir. 1998) (reversing the sentence due to insufficient findings on loss calculations); see also "United States v. Warshak, 631 F.3d 266, 329-30 (6th Cir. 2010) (remanding where the District Court's explanation of its loss determination was inadequate); United States v. Hall, 610 F.3d 727, 745 (D.C. Cir. 2010) (remanding for resentencing where the District Court provided no reason for finding loss to be in excess of one million dollars).

Where, as in this case, a "defendant objects to any of the factual allegations contained [in the PSR] . . . the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." See U.S. v. Ursillo, 786 F.2d 66, 68-69 (2d Cir.1986) (advocating that where a defendant challenges factual allegations in a presentence report, the sentencing court "must either make a finding concerning the objection or a determination that

such a finding is unnecessary because the matter controverted will not be taken into account in sentencing.");  and U.S. v. Lee, 818 F.2d 1052, 1056-57 (2d Cir. 1987) (stating government has burden of persuasion in assuring that information contained in presentence report is accurate and must prove facts in presentencing report by preponderance of evidence).  See also, United States v. Jenners, 473 F.3d 894, 897-98 (8th Cir. 2007) (citations omitted) (quoting United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004)).

The most crucial objection to the findings of the PSR pertains to the calculable loss in this case and the lack of governmental proof establishing alleged loss.  By way of the objection to the PSR, Mr. Illarramendi has preserved the right to request a hearing on loss, wherein the Government should be made to support all loss-related contentions with proof that can sustain findings on the record, commensurate with its alleged provable loss.

And while the Government does present its "Ong Declarations" in support of proposed loss calculations, the same are fraught with inconsistencies and methodological flaws.  This expert's purported loss calculation ignores clearly established guideline applications, and simply fails to adequately prove the actual loss alleged in this case.  Just as summaries of tables of accounting data that are based on evidence not before a Court, are insufficient to support a Court's factual findings, see e.g. United States v. Green, 428 F.3d 1131, 1134 (8th Cir. 2005) ("[T]he charts may 'include assumptions and conclusions, but said assumptions and conclusions must be based upon evidence in the record.'") (quoting United States v. Wainwright, 351 F.3d 816, 821 (8th Cir. 2003)), the Ong Declarations do little to advance the examination of the actual loss calculation in the case at bar.  When challenged, the conclusions and assumptions stated in summary accounting data are not evidence in and of themselves, and they are "more akin to representations by litigants."  Likewise, the conclusions in the Ong Declarations are more akin to

representations adopted by the Government, based on charts, summaries, and findings made by the Receiver in the related civil case.  See discussion, infra, Part V(e)(vi), pp. 41-64 (rebutting the adequacy of the Ong Declarations as sufficient for proving loss alleged by the Government).

### (ii)  Heightened Standards of Proof for Loss: Tail that Wags the Dog Cases

As with any other upward adjustment, the Government must prove the adjustment is warranted;  the Defendant is not required to disprove the applicability of the upward adjustment. Generally, "[t]he government bears the burden of demonstrating by a preponderance of the evidence that a specific Guideline enhancement applies."  See U.S. v. Melhado, Flynn & Associates, Inc., 455 Fed.Appx. 81, 83 (2d Cir.2012).  However, Courts have required heightened standards of proof in cases where the point adjustments significantly overshadow the substantive offense.  Mr. Illarramendi's case clearly fits this bill;  his "no loss" exposure to incarceration, even assuming other claimed increases for offense conduct, and loss of acceptance of responsibility, pales in comparison to the Guideline sentence contemplated to include a 28 point increase for an alleged $200-$400 million loss.

Because the proposed loss adjustment would have such an enormous effect on defendants' total sentence, the Government must prove the loss beyond a reasonable doubt.  The preponderance standard is plainly inadequate under such circumstances.  See, e.g., McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (suggesting that where a sentencing fact is "a tail which wags the dog of the substantive offense," the reasonable doubt standard may apply).  Indeed, the Fifth Circuit has expressly recognized that "there may be certain cases where a sentencing fact is a 'tail that wags the dog of the substantive offense' and might arguably require a finding beyond

a reasonable doubt." United States v. Mergerson, 4 F.3d 337, 344 (5th Cir. 1993) (quoting

McMillian, 477 U.S. at 88).[18]

Given the enormous consequences of the upward adjustment for "loss" in the instant case,

this Court should apply a "proof beyond a reasonable doubt" standard to the loss facts disputed

by Mr. Illarramendi for Sentencing purposes.  See United States v. Huerta-Rodriguez, 355 F.

Supp. 2d 1019, 1028-29 (D. Neb. 2005) (stating that regardless of constitutional limits on

advisory guidelines, it is unreasonable "to base any significant increase in a defendant's sentence

on facts that have not been proved beyond a reasonable doubt.");  see also United States v.

Harper, 360 F.Supp.2d 833, 836 (E.D. Tex. 2005) (recognizing Mares, but nonetheless noting

that the Court was respectfully required to "conclude that the even more recent Supreme Court

decision in Shepard v. United States, 544 U.S. 13 (2005), "require[d] that sentence enhancements

under the guidelines require[d] more than inferences drawn from a preponderance of the

evidence.").

Alternatively, a "clear and convincing" standard should apply to proof of loss in the

instant case, for the same reasons.  See United States v. Concepcion, 983 F.2d 369, 394 (2d Cir.

1992) (Newman, J., concurring) ("[A] strong argument can be made that the 'clear and

---

[18] Notably, while the Fifth Circuit recently stated that post Booker Courts "may" continue to apply a preponderance-of-the-evidence standard.  See e.g., United States v. Mares, 402 F.3d 511, 519-20 (5th Cir. Mar. 4, 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."), the Court's language was not mandatory.  Further, Mares was a plain error case, the facts of which did not confront the Court with the question of potentially higher standards.  Essentially, the Court cited U.S.S.G. § 6A1.3 commentary, acknowledging that a pre Booker preponderance standard is generally appropriate.  Id. at n.6.  Essentially, however, Mergerson and Mares are not incongruent, supporting the proposition that "tail that wags the dog" cases are subject to a proof beyond a reasonable doubt standard in the Fifth Circuit, under Mergerson, citing McMillan, supra at 477 U.S. at 88).

convincing evidence' standard should be used, at least for substantial enhancements [under the Guidelines]"); see also, United States v. Jordan, 256 F.3d 922, 927-28 (9th Cir. 2001) (clear-and-convincing standard applies sentencing enhancement resulting in "disproportionate impact" on sentence); and also, United States v. Townley, 929 F.2d 365, 370 (8th Cir. 1991) (suggesting that a sentencing factor that produces an 18-level increase may require clear-and-convincing evidence before it can be applied).

Notably, the applicable standard of proof must be applied with rigor.  Similar to narcotics cases (where the quantity of drugs may entail differences in prison time), "[c]ourts must sedulously enforce the quantum-of-proof rule," as even a modest difference in loss calculation "has a dramatic leveraging effect."  See e.g., United States v. Sepulveda, 15 F.3d 1161, 1198 (1st Cir. 1993).  "[D]istrict courts must base their findings on 'reliable information' and, where uncertainty reigns, must 'err on the side of caution.'"  Id. (citation omitted).

### (iii)  USSG Loss Parameters;  Limitations and Loss Reduction

When calculating the amount of loss, under U.S.S.G. §2B1.1(b), the "loss" is the greater of actual loss or intended loss.  See U.S.S.G.§2B1.1, cmt. 3(A).  "Actual loss" is defined as "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G.§2B1.1, cmt. 3(A)(i).  "Intended loss" is defined as "pecuniary harm that was intended to result from the offense."  U.S.S.G.§2B1.1, cmt. 3(A)(ii).  The Court may use "gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  U.S.S.G.§2B1.1, cmt. 3(B) (emphasis added).  The Court is not required to calculate the loss with mathematical certainty and can resort to a reasonable estimate of the loss, based on available evidence.  U.S.S.G.§2B1.1, cmt. 3(C).  The Government has not claimed

"gains" as a basis for the Guideline loss calculation, and since loss is in fact calculable, gain are not a permissible alternative regardless of a resultant low or zero loss calculation.

### (iv)  Loss Exclusions

When calculating the "loss," the court must exclude "interest" and "amounts based on an agreed-upon return or rate of return."  See U.S.S.G.§2B1.1, cmt. 3(D)(i).  Similarly, "costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense" are excluded as well.  U.S.S.G.§2B1.1, cmt. 3(D)(ii).  Moreover, after arriving at the initial "loss" amount, the court must apply credits against the loss.  See U.S.S.G.§2B1.1, cmt. 3(E).  One such credit is based on returned money and/or property, as well as services rendered, by the defendant (or those acting jointly with him) to the victims before the offense was detected.  U.S.S.G.§2B1.1, cmt. 3(E)(i).  Similarly, the "loss" is further reduced by any "collateral pledged or otherwise provided by the defendant" which has been rendered to the victims at the time of the sentencing, or the fair market value of any undisposed collateral available to the victims at the time of sentencing.  U.S.S.G.§2B1.1, cmt. 3(E)(ii).

It should be further noted that, where fraud is the cause of the loss, "causes other than the fraud must be excluded from the loss calculation."  U.S. v. Ebbers, 458 F.3d 110, 128 (2d Cir.2006);  U.S. v. Kumar, 617 F.3d 612, 632 (2d Cir.2010);  and U.S. v. Abbey,  288 F.3d 515, 518 (2d Cir.2002) (stating that "the district court generally must limit its loss determination to the losses caused by the defendant's fraudulent representations").

### (v)  Effect of Loss Stipulation at Time of Plea

Our Courts allow a sentencing judge to consider the stipulated loss figure in the Defendant's plea agreement, as long as the court also considers any loss evidence that is presented by the parties and "the record clearly demonstrates that the defendant fully understood

the potential consequences of his [stipulation]." See e.g., United States v. Ravelo , 370 F.3d 266, 272-73 (2d Cir. 2004);  and also United States v. Hartstein , 500 F.3d 790, 796-97 (8th Cir. 2007) and United States v. Camacho , 348 F.3d 696, 699-700 (8th Cir. 2003).  Our Circuit appears to require a sentencing judge to consider the stipulated loss figure in the Defendant's plea agreement, as long as (1) the court also considers any loss evidence that is presented by the parties and (2) "the record clearly demonstrates that the defendant fully understood the potential consequences of his [stipulation]." See United States v. Granik , 386 F.3d 404, 413 (2d Cir. 2004) (brackets in original).

### vi.  Loss Rules Application:  Rebutting the "Ong Declarations"

The Government's most current loss calculation position is set forth in the Declaration of Brian Ong, dated December 30, 2014.[19]  See Exhibit 3 (hereinafter referred to as "Ong II"). Additionally, the Receiver in the civil case has obtained approval and has commenced distribution to Receivership Claimants, pursuant to its Distribution Plan.  See Exhibit 1. Focusing upon Ong II, it is clear that the Government's most recent loss allegations attempt to more closely mirror the Receiver's Distribution Plan.  Nonetheless, Ong II, read in conjunction with Ong I, and the Receivership Plan, are not easily reconciled, without acknowledging fundamental foundational errors, and faulty propositions, which are in discord with the law of loss and Guideline requirements respecting the same.

---

[19] The "Ong Declarations" express the Government's proof of loss in the case at bar. The initial Ong Declaration is dated October 23, 2013 (attached hereto as Exhibit 7, hereinafter referred to as "Ong 1")), and the most current and updated supplemental is dated December 30, 2014 (attached hereto as Exhibit 3).

Proof of loss essentially rests in the Government's adoption of the Receiver's representations in the pending civil case against the Defendant.[20]  The Receiver has supposedly calculated losses based on the "net investment method" ("NIM").  See generally S.E.C. v. Illarramendi, 2013 WL 6385036 *1 (D.Conn. 2013).  NIM limits a claim of loss "to the principal balance deposited… and is reduced by the amount of any funds previously received including… dividends, loans, or other distributions.  In addition, customers may not assert claims for interest, dividends, or promised returns." S.E.C. v. Credit Bancorp, Ltd., 2000 WL 1752979*29 (S.D.N.Y. 2000)(attached hereto as Exhibit 6));  see also, In re Bernard L. Madoff Inv. Securities LLC., 654 F.3d 229, 233 (2d Cir. 2011)(commenting that "[t]he use of the Net Investment Method limits the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew, because only those customers have positive 'net equity' under that method.").

### a.   Ong and the Distribution Plan: Hyper-Inflated Loss Calculations

The declarations of Brian Ong and the Distribution Plan are erroneous and misleading in that they skew the financial reality of the MK Receivership, for the following reasons:

> (1) failure to fully and properly apply the recognized methodology (NIM) for loss calculation;
>
> (2) failure to subtract from loss, value erosion not attributable to the alleged fraud.
>
> (3)  failure to exclude from loss the effects of expenditures incurred by claimants of the Receivership in aid primarily of the prosecution of the case;  and
>
> (4) failure to recognize and apply the effects of the BROV exchange rate system on PDVSA's claim.

---

[20] SEC v. Illarramendi, et al., 3:11-CV-00078 (JBA)(Complaint attached hereto as Exhibit 8).

Taking these matters into account, and realizing the backdrop against which the claims have been made, it becomes clear that the Ong II losses cannot be reconciled with the reality of the situation in the case at bar, and does not present a reliable source for this Court's determination of the applicable loss for Guideline purposes

### b. The Receiver's Distribution Plan

The Distribution Plan conflates into five basic categories.  <u>See</u> Exhibit 1.  It pays 100% of the allowed claims in classes 1 through 3, totaling approximately $500,000.00.  In addition, it establishes the payment of 92% of allowed class 4 claims totaling $350 million and it plans on the payment between 2% and 11% of what is referred to as a "class 4A claim," comprised solely of a $372 million in a class investment claim by PDVSA.  Notably, apart from this "in kind" claim, PDVSA has been allowed a class 4 claim of $110 million, which is being repaid at 92% of value.

### c.  Ong II;  General Observations on Method

Mr. Ong lists assets in the Receivership totaling $354 million as of November 30, 2014.  The total amount of claims in classes 1 through 4 are listed in the Distribution Plan as $350 million.  Thus, for Guideline loss purposes, assets available in the Receivership in the form of collateral, as of November 30, 2014, are sufficient to cover 100% of these claims.  This would leave only PDVSA's "in kind" claim.  By applying the proper criteria for calculable loss in this case, PDVSA's claim should actually be "zero" and thus, the calculable loss would also be zero.[21]

---

[21] Notably, truthful information was provided by Mr. Illarramendi regarding the financial condition of the MK receivership entities, and he has attempted many times to explain the effect of the BROV exchange rate on the actual loss calculations.   He worked extensively with Mr. Ong and other members of the Receiver's team's to help them try and understand the

One obvious problem with Mr. Ong's approach, is that he draws upon only partial evidence for his conclusions.  See Ong Declaration, Exhibit 7 at ¶ 3 (stating he has reviewed relevant Court filings).  Some of the most illuminating evidence in the case at bar, however, is not contained in Court filings.  What's more, if Mr. Ong did review Court filings, he would have been placed on notice of the zero loss possibility, based on Mr. Illarramendi's pro se filings in the relevant civil matters.  Certainly, he would have been apprized of the fact that current exchange rates, operative in the BROV, would have an enormous impact on the assessment of Receivership assets, currently available for distribution.  Presumably, in an effort to facilitate the Receiver's fiduciary duties to claimants in the Receivership, one would expect that any function of currency that would increase distribution to the all of the Receivership entities, would be of significant import to Mr. Ong and/or his firm (who are assisting the Receiver in accounting matters).  He would easily have been able to ascertain that PDVSA's claims (which appear to comprise the totality of the loss alleged) are governed by documents[22] which provide for

---

actual financial principles and parameters, of the complex cross-border aspect of Receivership finances, and to establish the proper, fair, and just allocation of assets to valid claimants.

[22]See Assignment Agreements executed by PDVSA, dated December 29, 2011, one with PDV Insurance Co. Ltd., and another APJ International Ltd., Asociacion Civil Administradora de los Fondos de Pensiones de los Jubilados de Petroleos de Venezuela, S.A. y sus Filiales Fondoden Prevision de los Trabajadores de Petroleos de Venezuela, S.A., y sus Filiales. (not being attached hereto pursuant to Confidentiality Agreement pertaining to discovery materials disclosed in the case at bar, same to become the subject matter of an Order to Seal prior to any necessary filing or an agreement between the parties).  It is the Defendant's contention that these Agreements should be governed by BROV law, including, but not limited to the BROV Constitution, its banking laws, and its laws of exchange, applicable at any time material hereto.  As such, any indebtedness accrued in relation to the same may be paid back in the official currency of the BROV, using the official exchange rates.

repayment of the same in Bolivars, pursuant to the Constitution, banking, and exchange laws

operative in the BROV.[23]

Furthermore, had the Receiver contemplated, or had Mr. Ong suggested, that even a

miniscule portion of the millions in attorneys fees paid to the Receivership to date, be put toward

paying a Venezuelan attorney to consult on exchange rate, or "permuta" matters (which the

Receiver claims are incorporated into is calculations), they may have been apprized of the recent

decision in <u>Motores Venezolana C.A. Motorvenca</u> (holding that regardless of what is represented

---

[23] <u>See e.g.</u>, Constitution of the B.R.O.V. (1999), published in the Official Gazette of the BROV 39,419, May 7, 2010, in Spanish version (Apostille copy-attached hereto as h 9)(setting official currency at Bolivars, and that Central Bank has exclusive jurisdiction over B.R.O.V. monetary system, pursuant to 138);  Law of the Central Bank of B.R.O.V., published in the Offical Gazette of the B.R.O.V., No. 39,419, July 7, 2010, in Spanish version (Apostille copy-attached hereto as Exhibit 10)(establishing in Article 122 that Central Bank regulates currency and exchange in the B.R.O.V., and in Article 124 the power to limit and restrict conversion of BVD as necessary for stability and for international payments);  Convenio Cambiario No. 9, July 14, 2009, published in the Official Gazette of the B.R.O.V. No. 39,239, August 11, 2009, in Spanish version (Apostille copy--attached hereto as Exhibit 11)(requiring PDVSA to sell U.S. dollars received form sale of hydrocarbons and other international transactions to the Central Bank of the BROV);  Convenio Cambiario No. 14, December 30, 2010, published in the Official Gazette of the B.R.O.V. No. 39,584, December 30, 2010, in Spanish version (Apositlle copy--attached hereto as Exhibit 12)(setting exchange rate at 4.2893 for purchase and 4.30 for sale); Convenio Cambiario No. 14, February 8, 2013, published in the Official Gazette of the B.R.O.V. No. 40,108, February 8, 2013, in Spanish version (Apostille copy--attached hereto as Exhibit 13) (setting exchange at 6.2842 BVD for purchase and 6.3 for sale);  Convenio Cambiario 27, March 10, 2014, published in the Official Gazette of the B.R.O.V., No. 40,368, March 10, 2014, in Spanish version (Apostille copy--attached hereto as Exhibit 14)(establishing the SICAD II);  Convenio Cambiario 28, April 3, 2014, published in the Official Gazette of the B.R.O.V., No. 40,387, April 4, 2014, in Spanish version (Apostille copy--attached hereto as Exhibit 15)(establishing SICAD II will apply to sale of currency by PDVSA for any non-hydro carbon activities, and all other activity remains governed by July 14, 2009 exchange agreement);  Convenio Cambiario 30, Sept. 23, 2014, No. 40,504, September 24, 2014, in Spanish version (Apostille copy--attached hereto as Exhibit 16)(pursuant to exchange agreement No. 9, PDVSA can sell at any official rate, to Central Bank, to obtain required BVD earmarked for FONDEN—created to finance investment projects in education, health and special strategic situations); <u>and also</u>, Banco Central de Venezuela Resolucion No. 13-07-01, dated July 2, 2013 (Apostille copy--attached hereto as Exhibit 17)(establishing the SICAD I market as yet another exchange)(Spanish version Exhibits to be supplemented in relevant portions with English counterparts).

as the currency in any contract, any debt owed to a Venezuelan entity is payable in Bolivars).
See, Decision Rendered by the Constitutional Chamber of the Supreme Court of Justice, Case
File N009-1380 of Nov. 2nd 2011(Motores Venazolana C.A. Motorvenca) (apostilled copy
attached hereto as Exhibit 18).  Notably, this decision predates PDVSA's purchase of the claims,
by approximately one month.  Essentially, the BROV's Constitutional Chamber held that foreign
currency, if recited in an instrument of exchange, serves as a mere referential framework—a
simple "tabulator" with which to convert any Venezuelan debt into Bolivars.  Part of the
rationale is clear;  namely, that the parties cannot hold foreign currency in an amount greater
than stipulated or regulated by BROV law.  Arguably, this is what PDVSA would be doing, in
the event that its claims are paid out as suggested by Mr. Ong.  Interestingly, the Oil Company,
in effect, would have made a slick investment in Assignments upon which it could never lose
money, especially given its sole shareholder's (BROV) constitutional power to unilaterally
determine exchange rates, and limitations on the use of U.S. dollars by anyone who would hold
the same in the BROV.

 Apparently, however, Mr. Ong and the Government have simply ignored much of what
Mr. Illarramendi has attempted to make clear, in what appears to be an effort to justify an
enormous life-sentence-generating loss calculation, rooted solely in the reality of the Receiver,
and his claim to a .920 percent batting average for Claimants in class 4.  Ironically, the
Receiver's high return rate is also supported by the contrary view propounded by Mr.
Illarramendi;  namely, and more simply, that the loss is nowhere near as large as the Receiver
originally contemplated and/or claimed.

 For these reasons, Mr. Ong's declarations, standing on their own, should be viewed with
a healthy skepticism by this Court.  Mr. Illarramendi should be afforded a full hearing where

both he and Defense experts can testify further in regard to the faulty presumptions inherent in the Ong declarations, the Distribution Plan, and the hyper-inflated loss calculation Mr. Ong offers for consideration by this Court.

### d.  Ong I & II:  The Sworn Claims Analysis: Misleading & Erroneous

Mr. Ong states that the assessment of "approximate losses suffered by the [victims] of Illarramendi's fraud is the total of the claims submitted to the Receiver through the Receivership claims administration process (the "sworn claims"), excluding certain adjustments as set forth herein, less the Adjusted Cash and Investments, as defined herein, as of November 30, 2014." See Exhibit 3, ¶ 5, n.1.  This statement is simply misguided.  In addition, the loss calculation of $382 million[24] inherits the same misguidedness.

### i.  Sworn Claims as a Starting Point;  False Start

Mr. Ong states, that the sworn claims should be taken as a valid starting point for loss calculation, because they were filed by claimants under the penalties for false and/or misleading representations.  The fact that a person or entity is told that submitting a fraudulent claim to a Receivership is against the law, however, does not guarantee that all submitted claims are therefore valid.  It is common knowledge that many have made false claims in fraud and bankruptcy proceedings, making it clear that the sole existence of the warning, or the law for that matter, are no guarantee for the validity of any claim.  In this case, the fact that Mr. Ong would portray in a footnote his belief that claims are valid because they are supposedly "sworn," is made more egregious in light of the fact that the largest sworn claim originally made against the Receivership (the $1.3 Billion claimed by Highview Point Offshore "HPO") was clearly, and

---

[24] Mr. Ong's first Declaration in Ong I, listed the loss amount as $521 million.  He has since then, reduced his loss calculation in Ong II to $382 million which essentially brings him in line with the Receiver's Distribution Plan.

unequivocally, invalidated.  This claim was likely fraudulent from the outset, even though the Receiver chose to carry the claim and the ominous claim amount through several interim reports. The claim documents submitted by HPO show absolutely no validity for this claim.

Also, Mr. Ong, the Receiver, and the SEC, have had intimate knowledge of the finances of HPO to date, and had the same many months prior to the claim;  the Claimant's manager, Highview Pont Partners ("HPP") was incorporated into the Receivership in May, 2011 (some six months before the claim was submitted).  The Receiver had all the Claimant's books and records. Likewise, the SEC had all of the Claimant's financial information, having acquired it in a 2010 entity examination.  It is evident from the HPO claim forms, that the Receiver first rebuffed the Claimant. The Claimant was required to submit supplemental materials which, nevertheless, showed no basis for a real claim.  The fact that this claim was later withdrawn in exchange for benefits negotiated with the Receiver privately and confidentiality, and not reported to any other Claimant in the Receivership, is irrelevant to the reality that:  (1) The claim was at least invalid, and possibly fraudulent, from its inception, and (2) the claim should have never been recognized as credible, much less contemplated by Mr. Ong as an example of "the most accurate, current assessment of the approximate total investment by the [victims]"  See Ong II, ¶ 6.

Notably, the largest possible HP to MK exposure was $90 million dollars;  all funds including significant gains were fully repaid from MK to HPO by May, 2010.  Furthermore, the total capital invested, plus gains at the HPO level for all of its transaction history was, at the time of the claim, close to $230 Million dollars, all of which was held in cash at that time in a Receivership account under Court order.

 Finally, the amount of principal invested by HPO at the time of the claim, as evidenced in the Stipulation of Settlement signed by the Receiver and HPO, certifies that the Gross Capital

Invested by HPO investors in the entity was, at most, a total of $170 million dollars.  Clearly, the great divide is visible;  the submitted claim of $1.3 billion is almost eight times the amount of principal.  This math has no basis in reality, and could never have been considered valid under any circumstances, let alone under the ones attendant upon the loss calculation by this Court.  Using the premise of sworn claims, as is evident by examination of the HPO example, Mr. Ong destines himself from the outset to an inaccurate determination of the loss.

### ii.  Distribution Plan Facts

Interestingly, the Receiver's distribution plan contemplates payment of 92% of all general unsecured or "cash" claims totaling $350 million dollars.  PDVSA's portion of these claims is $110 million dollars (The PDVSA cash claim).  In addition the plan contemplated payment of up to 11% of what is described as PDVSA's in kind claim of $372 million.  See generally, Exhibit 1 (Receiver's Distribution Plan).  The resulting shortfall claimed by the Receiver is simply mirrored in Ong II, at approximately $382 million.  This claim is inaccurate, however since:

1.) It includes in the loss calculation at least $68 million[25] in expenses incurred that have aided in the prosecution of the case.

2.) It fails to reduce the PDVSA claim by more than $600 million in financial benefits and fair market value of services derived by PDVSA from the Receivership[26];

---

[25] According to Receiver's filings it has already paid out $54 million in fees and disbursements, while Mr. Ong lists an additional $14 million of unpaid expenses in his declaration and charges them erroneously against loss.  See Ong II, Exhibit 3.

[26] These gains, for which the Receiver has ample evidence, include gains of close to $50 million dollars for transactions listed by the Receiver in related lawsuits, as well as more than $200 million in gains for PDVSA's wholly owned subsidiary Electricidad de Caracas generated in a MK led financial advisory.  In addition there were over $300 million in gains derived by the BROV in VEB/USD arbitrage transactions executed by HVP and MK.

3.) It fails to reduce the amount of PDVSA claim by negative effects in the value of assets caused by market forces that are unrelated to the alleged fraud[27];

4.) It fails to account for the currency market effect on the amounts due PDVSA[28];

5.) It fails to take into account "unclean hands" "unjust enrichment" principles; and

6.) It fails to acknowledge negotiated claim allowances such as $45 million allowed in claims to Fractal Funds, which should not count towards loss, and it fails to provide any allowance for recovery from pending litigation.[29]

### e.  PDVSA Claims Reductions:  Mandated by Law-Ignored by Ong

The Ong Declarations ignore certain reductions, which would be obvious, upon a

moderately close look at the books and records of MK.

### i. Cheyne Funds

A reduction in the loss amount is called for in relation to the Cheyne funds.  Cheyne is

absolutely and completely independent of MK, and the decision to invest in Cheyne was

made entirely by PDVSA, years before subscribing the shares to MK.  Other than the sale to

---

[27] Part of the allowed "in kind" claim for PDVSA is composed of $202 million in shares of the independent "Cheyne" funds, submitted by the claimant at a misrepresented value, and which was never fully monetized by the Defendant.

[28] Both the claim amounts for PDVSA and the amount of cash available for repayment of that claim must be accounted for using the proper value in VEB, given the fact that PDVSA's acquisition of it's claim rights was made in VEB as dictated under Venezuelan law, the legal framework which governs the acquisition of these claim rights as well as the repayment of any foreign currency obligation due to an entity domiciled in Venezuela.

[29] To clarify this point, the fact is that the cash flows or other forward gains received by the Claimants are fully supported by the documentation held by the Receiver and, therefore, even in the case that there was no litigation initiated by the Receiver, the amount listed in Exhibt "C" to Ong II, should effectively be deducted from claims made by the defendants in those litigations. These reductions, being mandated by the NIM, should be made irrespective of whether or not the Receiver (such as in the flawed and potentially fraudulent case of the Fractal and HPO) negotiated settlements result in a civil agreement allowing payout of a portion of the claim.  For loss calculation purposes, any amounts that have been paid to a claimant as principal, interest, gain on a transaction, or otherwise, should be netted against any claim presented, unless the claimant has reflected the same in claims forms, and is actually presenting a claim net of repaid amounts.

CS of approximately $30 million in nominal amount of shares, with a market value of approximately $23 million in cash, MK had absolutely no responsibility for any variation in the value of the Cheyne shares.  The amount of $202 million, portrayed by PDVSA as the value of the assets at the time of the subscription in MK, was a misrepresentation.  According to Receivership records, this means that the allowed amount of $202 million at which the Cheyne shares have been included in class 4A of the Distribution Plan, should be reduced by at least $70 million dollars, and more accurately and/or likely by a total of $170 million, unless the Receiver can present evidence to the contrary.  The overall effect of this first reduction, which should have been applied by the Receiver and Mr. Ong in relation to PDVSA's 4A claim is that, instead of being a $372 million loss, the same would be closer to $200 million, ab initio, without further applicable reductions.

### ii. Previous Gains and Benefits Related Reductions

PDVSA claims must be reduced by the previous listed gains, and financial benefits applicable (in keeping with the NIM), and also by fair market values of services rendered.  As has been estimated generally above, the total of such reductions can reach $600 million dollars, effectively bringing the full amount of PDVSA claims under both classes, 4 and 4A, to zero;  ultimately, reduction would support a zero loss, in direct contradiction to the Ong Declarations.

### iii. BROV Law:  Exchange Rates and Repayment

The law governing the acquisition costs of PDVSA's claim rights, has an enormous impact on the loss calculation, even if this Court was not satisfied that any of the aforementioned reductions were applicable under the NIM.  Based on applicable law, the dual exchange rate mechanism currently instituted by the BROV and PDVSA would reduce

the amount required to pay the totality of PDVSA's gross claim, to approximately $42 million dollars.

The result stems from the fact that PDVSA, by virtue of the Assignment Agreements signed with the original claimants, has fully compensated them for the full gross amount allegedly invested by them in the Receivership, in cash or in kind, during the relevant period. The payment made by virtue of the obligation acquired by PDVSA, in exchange for obtaining the claim rights, would have been made under and pursuant to Venezuelan law. Under this legal framework, due to ferrous exchange controls, and the decision in Motorvenca, supra, issued one month prior to the acquisition of claims by PDVSA, the payment made by PDVSA was done in bolivars at the official exchange rate. See Exhibit 12, Cambiario No. 14, dated December 30, 2010 (setting exchange rate at 4.2893 for purchase and 4.30 for sale). By convergence of the banking law, Constitution, and the decision in Motorvenca, any other form of payment other than bolivars would have resulted in a violation of Venezuelan Law, and presumably the Assignment Agreements. This proposition itself, presumes that PDVSA's undertaking of the claims was done in compliance with all local and other applicable laws and regulations pertaining to investors. Otherwise, of course, PDVSA comes to the table with unclean hands, in contravention of BROV law.

Presuming that consideration paid by PDVSA to the Assignors, equaled $482 million,[30] the maximum possible loss would be ascertained by conversion of that amount into bolivars. Here, $482 million, multiplied by then contemporary official rates of 4.30 VEB per USD, would require repayment in the amount of $2.07 billion bolivars. This would constitute the

---

[30] The Assignment Agreements total $573 million in nominal value of claim rights, however the Receiver has reduced this amount to an allowed claim value of $482 million, comprised of $110 million in general unsecured "cash" claims, and $372 million in "in kind" claims.

"maximum allowable principal amount," subject to loss calculations recognized by the Guidelines/NIM. Accordingly, to satisfy any debt owed to PDVSA in the effort to ensure no loss, the Receiver could simply pay out $2.07 Billion Bolivars in respect thereof. Ignoring all other potential reductions, such a payout would effectively eradicate any claimed loss.

As noted, PDVSA can legally obtain bolivars under the current alternative exchange rate mechanism instituted by the BROV, at a rate of approximately 50 bolivars per U.S. dollar. See, Exhibit 14, (BROV exchange law establishing exchange rate for SICAD II at 49.9 bolivars to 1 U.S. dollar). Therefore, even if the Court were to ignore the applicable gains which would be netted against the PDVSA gross claim amount under NIM, and it were to also ignore the reductions applicable for duplication of the Fractal claim, and for the non-fraud related value decrease in Cheyne shares, the highest amount required to repay PDVSA's Receivership invested principal under the Assignment agreements, would be $41.1 million. From the viewpoint of Receivership finances, as indicated above, PDVSA has already been paid at least twice this amount pursuant to the Receiver's initial distribution. See Exhibit 1 (allowing $110 million of $134 million claimed).

As a corollary, Receivership resources in the amount of $313 million cash identified in Ong II, could satisfy the remaining $240 million in total allowed claims from other investors, as listed in the Distribution Plan. This would leave a positive asset balance in excess of $73 million, not including add backs for expenses made in connection with prosecuting the offense.

There is ample evidence that both the Receiver, and therefore the Government, have had evidence supporting a zero loss calculation in the instant case for some time. By way of the application of relevant exchange rates and BROV legal framework alone, to the exclusion of

all other viable gains and/or set offs, there is more than enough money in Receivership

coffers to pay any valid PDVSA claim, and still have a surplus.  Any further distribution to

PDVSA would, by implication, suggest that this Court should countenance the unjust

enrichment of PDVSA (and effectively the BROV itself), at the expense of other clearly

more deserving claimants, and for the sole purpose of increasing Mr. Illarramendi's

Guidelines.

### iv.  Summarizing Calculable Loss Issues Per the Ong Declarations

Calculable Loss proposed in the Ong Declarations, misrepresent the financial condition

of the Receivership and fail, even under the lowest standards of proof, to establish an

accurate loss calculation in the case at bar, pursuant to the applicable sentencing guidelines.

The misapprehensions in the Ong Declarations are apparent on several fronts, all of which

have been addressed and/or dispelled above, including the facts that the Declarations:

a.  Misrepresent the equivalence of money invested by the
claimants as the gross "Victim Loss Amount":

b.  Misrepresent that accrued and unpaid administrative expenses should be added
to the loss calculation which directly contravenes the Guideline instructions on
the subject matter;

c.  Fail to "add back" for administrative expenses which have been paid, in
contravention of the Guideline instructions;

d.  Fail to reduce claims by either:

1) all amounts applicable under the "NIM" to PDVSA, as well as the
money returned to PDVSA in any way shape or form as part of  the fair
market value of services rendered by the Defendant to PDVSA during the
relevant period. See USSG §2B1.1, cmt. n.3(E)(i): or

2)  all amounts attributable to erosion of market value unrelated to the
alleged fraudulent activity;

e.  Fail to account for currency arbitrage gains, and investment values that should be applied to PDVSA's NIM calculation, as well as the value of allowed PDVSA claim amounts; and

f.  Fails to account for the potential unclean hands principle applicable to PDVSA claims that exceed repayment of principal investment, given the governing BROV law and exchange rates.

The failure of the Ong Declarations to support the loss claimed by the Government is not surprising, in light of the faulty premises, and misguided math inherent in the same.

### v.  A More Accurately Stated Loss Formula

The more accurate representation of the Receivership's financial condition would be captured in the following formula:

| | |
|---|---|
| Allowed claims: | $732 million |
| Applicable Reductions: | $482 million |
| Resulting Maximum Payable claims: | $250 million |
| Value of Assets on hand: | $354 million |
| Add back of expenses for loss calculation purposes: | $54 million |

**CALCULABLE GAIN** = $158 million.

Alternatively, if the Court chose to ignore the PDVSA reductions mandated under the guidelines, the resulting maximum payable claims, including $41.4 million to satisfy PDVSA's allowed claim amount would be $291.4 million, leaving a calculable gain balance of $117 million.  In either case, the loss, while calculable, remains zero.

### vi.  Summary of the Loss Calculation for Sentencing Guidelines Purposes

As is made apparent, upon closer inquiry, (1) the loss is calculable, and (2) the calculable loss is nil.  Based upon the applicable standards of proof, and upon the failure to recognize double counting, the effect of the Permuta and Exchange Rates/Markets in effect at relevant times, and the set offs for non-fraud related items, Mr. Ong cannot justify the loss he claims, and no upward point adjustment is applicable for "loss" under the advisory Guideline calculation.

Based on the applicable law and circumstances surrounding instant offenses, the Defendant's proposed Guideline calculation, before applicable departures, is as follows:

| | | |
|---|---|---|
| Base Offense Level | USSG. §2B1.1 | 7 |
| Specific Offense Characteristics | | |
| i)  Loss | USSG §2B1.1(b)(10)(A) | +0 |
| ii)  Scheme outside of U.S./sophisticated | USSG §2B1.1(b)(10)(B) | +2 |
| iii)  Investment Advisor enhancement | USSG. §2B1.1(b)(18)(A)iii | +4 |
| iv)  Acceptance of Responsibility | USSG  §3E1.1(a) | - 2 |
| | | _____ |
| | TOTAL: | 11 |

While the degree of departure is left to the sound discretion of this court, Mr. Illarramendi's substantial assistance to the Government, his voluntary disclosure of the offense, the fear of physical harm and other coercion from the Venezuelan authorities, strongly mitigate in favor of a significant downward departure.

## VI. Step Two:  18 U.S.C. §3553 Factors

Pursuant to 18 U.S.C. §3553(a), the sentencing court "shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," which are "the need for the sentence imposed to:

(i)  reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

(ii)  to afford adequate deterrence to criminal conduct;

(iii)  to protect the public from further crimes of the defendant; and

(iv)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. See 18 U.S.C. §3553(a)(1)–(7).

Addressing fraud-type cases specifically, some legal scholars point out that "[w]hile the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." See Allan Ellis, John R. Steer, Mark Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011). As one U.S. District Court eloquently noted:

> "[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so. This reality does not render the Guidelines irrelevant in fraud cases; they are in fact quite useful in all sentencings. But sentencing judges know that a full consideration of 'the nature and circumstances of the offense and the history and characteristics of the defendant,' 18 U .S.C. § 3553(a)(1), implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in the Commission's Guidelines Manual. A consideration of those and the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range. Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider."

U.S. v. Ovid, 2010 WL 3940724,*1 (E.D.N.Y. 2010)(attached hereto as Exhibit 19). As in any other case, the need for retribution in Mr. Illarramendi's case should be measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea) [and]

motives."  See, Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth

Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005).

In the present case, in light of the circumstances of Mr. Illarramendi's offense and

subsequent conduct, substantial variance is warranted due to a number mitigating factors, all of

which are highly relevant to the purposes of sentencing, and none of which are adequately taken

into account by the guideline range.

### a. **Defendant's Motive**

Mr. Illarramendi's fraudulent conduct was not aimed at or motivated by personal gain.

He did not defraud investors in order to put their money into his own pockets.  Rather, Mr.

Illarramendi was desperately trying to rehabilitate the funds under his management from the

shortfall created by the initial loss related to the Calyon business transaction that went bad. His

"scheme" was for the benefit of all investors, calculated to close the "gap" in the future, for

protection of the managed funds, and to restore them to a healthy condition.  As the U.S.

Supreme Court pointed out, "[t]he defendant's motive for committing the offense is [an]

important factor" in sentencing.  See Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) citing 1

W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986) (remaking that

"[m]otives are most relevant when the trial judge sets the defendant's sentence, and it is not

uncommon for a defendant to receive a minimum sentence because he was acting with good

motives, or a rather high sentence because of his bad motives");  see also, U.S. v. Mahan, 232

Fed.Appx. 796, 799-800 (10th Cir. 2007) (noting sentence was procedurally unreasonable where

district court refused to consider defendant's stated motive for possessing unloaded shotgun,

namely, that he had been violently beaten by three men and sought to defend his wife); U.S. v.

Milne, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did

not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat");  U.S. v. Ranum, 353 F. Supp. 2d 984, 990 (E.D.Wis. 2005). (recognizing defendant did "not act for personal gain or for improper personal gain of another").

Simply put, Mr. Illarramendi's case is distinguishable from a case in which a defendant misappropriates money to support a lavish lifestyle.  His motive was to restore the value of the assets under his management for his investors.  He felt compelled to engage in his fraudulent conduct because of a perceived threat to him, and his family, from the Venezuelan authorities. He did not see any other alternative that would keep them safe, and at the same time not endanger the investments that he was managing.  Even if Mr. Illarramendi is not eligible for a departure under §5K12, his actions were nonetheless motivated in large part by fear of physical and professional retribution against him and his family, by governmental authorities or their intermediaries.  Disclosure of the cash flow shortfall would entail with it, disclosure of the cause, and the identities of those individuals who already made credible threats against him.  Thus, the cover up and fabrication on his part was an act of desperation, not of simple self-serving greed.

### b. Defendant's Conduct was Aberrant

Prior to the instant offenses, Mr. Illarramendi lived a law-abiding life.  He was an experienced and competent professional in the financial sector, he used his skills and insight to improve the Venezuelan economy.  He was and continues to be a dedicated husband and father. He did not engage in criminal conduct until he was confronted with corruption in the BROV that led to his current offenses.  Thus, his "offense conduct" is completely uncharacteristic when viewed in the context of his entire productive adult life.  This Court should grant a variance based on the aberrant nature of his conduct.  See, e.g., U.S. v. Howe, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life);  U.S.

v. Hadash, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing");  U.S. v. Davis, 2008 WL 2329290 (S.D.N.Y. June 5, 2008)(attached hereto as Exhibit 20)(defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

### c.  **Totality of Defendant's Punishment is Far Beyond What is Just.**

As a result of the current prosecution and SEC civil proceedings, Mr. Illarramendi lost his professional reputation and likely lost his ability to work in the financial sector in the future.  His case was widely publicized in the media where he was touted as the "Bernie Madoff" of Connecticut.  His assets were frozen by Court order and he had to support himself and his family by relying on charity of his friends, and borrowing money from relatives, without a prospect of being able to repay them in the near future.  Furthermore, Mr. Illarramendi has already experienced an extensive period of confinement under house arrest and in jail.  Mr. Illarramendi's family has been decimated.

This Court should consider Mr. Illarramendi's loss of profession and reputation in determining his sentence.  See, e.g., U.S. v. Carty, 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures");  U.S. v. Gaind, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); U.S. v. Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials);  U.S. v. Samaras, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).  Thus, the totality of the punishment already experienced by Mr. Illarramendi, and

the prospective future punishment outside of the sentence to be imposed (i.e. loss of reputation, loss of employability, etc.), should be considered by this Court, and should provide adequate basis for a variance from the suggested Guidelines sentence.

### d.  Need For Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  Id. at 1.  It examined the effects of changes to both the certainty and severity of punishment.  Id. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance."  Id. at 2.  The report concluded that "[t]he studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  Id. at 1.  Research regarding white collar offenders in particular (presumably

the most rational of potential offenders) found no difference in the deterrent effect of probation

and that of imprisonment.  See David Weisburd et al., Specific Deterrence in a Sample of

Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Gabbay,

supra, at 448-49 (stating that "there is no decisive evidence to support the conclusion that harsh

sentences actually have a general and specific deterrent effect on potential white-collar

offenders.").

### e.  Need For Incapacitation

Mr. Illarramendi is a 45 years old, first time offender, college graduate holding  advanced

degrees;  he has been employed throughout his adult life, is married with children, and has no

history of drug or alcohol abuse.  Mr. Illarramendi's age, education, lack of prior criminal history

and ties to his family are strong indicators of lack of possible recidivism in the future.  He is not

a potential threat to the public, and is unlikely to commit further crimes.  Additionally Mr.

Illarramendi entered into a voluntary agreement with the SEC, pledging him to a lifetime ban

from the securities industry.  The court should give Mr. Illarramendi's personal history due

consideration in deciding whether to vary from the suggested guidelines sentence.  See, e.g., U.S.

v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance based on first

timer status);  U.S. v. Hamilton, 323 Fed. Appx. 27, 31 (2d Cir. 2009) (remarking that "the

district court abused its discretion in not taking into account policy considerations with regard to

age recidivism" which was not captured in the Guidelines");  U.S. v. Holt, 486 F.3d 997, 1004

(7th Cir. 2007) (affirming sentence below-guideline range based on age making it unlikely

defendant would commit or be involved in another violent crime);  U.S. v. Cabrera, 567 F. Supp.

2d 271, 279 (D. Mass. 2008) (granting variance due to fact that defendants "with zero criminal

history points" are less likely than all other offenders to recidivate);  Simon v. U.S., 361 F. Supp.

2d 35, 48 (E.D.N.Y. 2005) (basing variance partly on age of 50, because recidivism rates decrease in proportion to age);  U.S. v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on first-time offender status and age, since guidelines failed to "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

### f.  Actual Imprisonment is Not Necessary

Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."  28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."  See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984).  Mr. Illarramendi is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."  Thus, in light of the law and circumstances as more fully set forth in this Memorandum, a split sentence or a sentence that entails home confinement instead of prison would be appropriate.

**g. Fundamental Guideline Flaws to be Considered by the Court**

The Defendant's guideline calculation per the PSR, is clearly driven by the single enhancement for loss amount.  If not for a 28 level enhancement, Mr. Illarramendi's total adjusted guidelines could be as low as between 11 (8 to 14 months) and 14 (15 to 21 months), presuming a criminal history category of I.  Essentially, Mr. Illarramendi would by now have served a period of incarceration to satisfy the penalties of either total.  While an upward enhancement geared toward larger frauds appears to be reasonable in context, the escalating enhancement in the loss table at 2B1.1(b)(1) is unreasonable.  It is disproportionate to other enhancements in the section, and in the Guidelines in their entirety.  Effectively, the Guidelines appear somewhat meaningless in white collar cases. See United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) aff'd  301 Fed. Appx. 93 (2d. Cir. Dec. 9, 2008)(warning of "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense");  accord, United States v. Paris, 573 F.Supp. 2d 744, 754 (E.D.N.Y. 2008) (describing the guidelines for white collar crimes is " a black stain on commons sense," sentencing defendant to a 60 months in spite of advisory "guideline range of 360 months to life").

No other enhancement in the fraud section even approaches the 28 level enhancement which Mr. Illarramendi faces.  A review of the Guidelines confirms generally that the largest enhancements appear to be as follows:

Obstruction of Justice/Terriorism (2J1.2(b)(1)(c))         12

Felony Promoting Terrorism (3A1.3(a)(a))                  12

Boarding Aircraft/Dangerous Weapon/Material (2K1.5(b)(1))      15

Trafficking Receiving Portable Rocket Launcher  (2K2.1(b)(3)(A))   15

Unlawfully Remaining after major felony  (2L1.2(b)(1)(A))        16

Bid Rigging/Price Fixing Over $1,500,000,000 (2R1.1(b)(2)(H)      16

Other than the enhancement for loss amount under 2B1.1(b)(1), the largest enhancements in all of the Guidelines are 12 to 16 levels;  notably, a 28 level enhancement for fraud loss is, therefore, enormously disproportionate considering the Guidelines as a whole.

The fraud enhancement simply cannot be an instance of sound public policy--that the most serious aggravating factor in the whole Federal Criminal law, by virtually double the amount of the next closest factor, is fraud loss.  While comparing sentencing enhancements in a vacuum is not a perfect study, it is instructive.  The guidelines take into account the seriousness of an offense by setting a base offense level.  And they account for aggravating factors by applying enhancements.  Taking into account Mr. Illarramendi's pre-enhancement base offense level, demonstrates that the 2B1.1 enhancement is disproportionate;  here the enhancement is approximately 400 percent greater than the base level.

Interestingly, there is no indication that the enhancement in 2B1.1 is based in real world policy, versus changing politics.  Notably, the enhancement was added in the 2003 Amendments to the Guidelines, in the wake of such corporate scandals as Global Crossing, Enron, and Worldcom.  See U.S.S.G. 2B1.1 (Historical Notes)(2003 Amendments)(recognizing prior enhancement maximum of 26 levels).  These amendments expanded "the loss table at 2B1.1 to punish adequately, offenses that cause catastrophic losses of magnitudes previously unforeseen, such as serious corporate scandals to several portions of the [Sarbanes-Oxley] Act."  U.S.S.G., 2B1.1 (Historical Notes) (2003 Amendments).  While the changes may have been politically

responsive, they were not rooted in any empirical data or evidence, supporting a claim that more severe sentences were even warranted.

The fact is, that Courts have "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white collar offenders."  See Adelson, supra at 514 (citing U.S. Sentencing Commission, 15 Years of Guideline Sentencing 56 (2004), for the proposition that the guidelines were "written, in part, to ensure a short but definite period of confinement for a larger proportion of . . . white collar cases, both to ensure proportionate punishment and to achieve deterrence.") (emphasis in original);  see also, Peter J. Henning, White Collar Crime Sentences After Booker:  Was the Sentencing of Bernie Ebbers Too Harsh, 37 McGeorge L. Rev. 757, 781 (2006) (stating that "one significant goal of the Guidelines was to create a system in which white collar offenders received 'short but definite periods of confinement,' and moving away from sentences that did not include at least some term of imprisonment").

In summary, the loss enhancement in 2B1.1 is simply not rooted in any empirical evidence, demonstrating that such a severe enhancement is warranted and/or indeed necessary. See United States v. Cavera, 550 F.3d 180, 192 n.9 (2d Cir. 2008) (citing Kimbrough v U.S., 552 U.S. 85, 128 S.Ct. 558, 576 (2007)).  In Kimbrough, the Supreme Court found that "[i]n formulating guideline ranges for crack cocaine offenses," the Sentencing Commission failed to "take account of empirical data and national experience."  Id. at 575.  The Court noted that "the crack/powder disparity produce[d] disproportionately harsh sanctions," and held that "it would not be an abuse of discretion for a District Court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve 3553a's purposes, even in a mine-run case."  Id.

Similarly, the 2B1.1 fraud guideline should also require such searching analysis; the potential for disparity in the application of the enhancement is obvious, and against must be scrutinized closely to prevent unfairness. In the case at bar, application of the 2B1.1 enhancement stands to imprison a first time offender, age 45, father of two young children, for life, for an offense involving no violence, and a corrupt foreign government claimant that stands to inherit huge windfalls based upon an exchange rate that is effectively a function of its will. Accordingly, a non-guideline sentence mitigating the harsh application of the 2B1.1 in this case is appropriate.

## **CONCLUSION**

For all of the foregoing reasons, Mr. Illarramendi submits that a sentence of time served, followed by six months' home confinement, and five years' supervised release is sufficient, but not greater than necessary to satisfy the purpose of sentencing. Alternatively, in light of a zero loss calculation, and the departures and reductions argued for herein, Mr. Illarramendi should be sentenced to a guideline range tracking a total adjusted number of 11 points, with due consideration given to the fact that he has spend approximately two years in jail to the time of sentencing. Mr. Illarramendi should be afforded a full hearing where both he and Defense experts can testify further in regard to the faulty presumptions inherent in the Ong Declarations, the Distribution Plan, and the hyper-inflated loss calculation Mr. Ong offers for consideration by this Court. Clearly, the Ong Declarations do not prove the loss on a preponderance, let alone on a clear and convincing basis, or beyond a reasonable doubt, both of which appear to be the more appropriate standards in cases such as this one, where the enhancement tail wags the base offense level dog.

Mr. Illarramendi is entitled to a hearing on the "loss calculation," wherein the Government bears the burden of proof of establishing the loss asserted.  To date the Government has not provided this Court with adequate proof of the alleged loss, and the Defendant hereby requests a "loss" hearing be held prior to this Court's adoption of any aspect of the Ong Declarations put forth by the Government as proof of actual loss.  The Defendant hereby requests that he be entitled to cross examine Mr. Ong, and otherwise challenge the Government's proof, by leading his own expert and/or lay witness testimony in support of the "zero loss" position asserted herein.

Respectfully submitted,

By: _____/ls/sseeger_____
    Stephan E. Seeger (ct 19234)
    Law Offices:  S.J. Carriero, LLC
    810 Bedford Street, Suite #3
    Stamford, CT  06901
    Tel: (203) 203-273-5170
    Fax: (203) 357-0608
    seegerkid2@aol.com

## <u>CERTIFICATE OF SERVICE</u>

I, Stephan Seeger, hereby certify that on January 12, 2015, a copy of the foregoing

**DEFENDANT'S SENTENCING MEMORANDUM** was filed electronically, and served by

mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties

by operation of the Court's electronic filing system or by mail to anyone able to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

Court's CM/ECF system.

_____s/Seeger_____
Stephan E. Seeger